UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

DOMINIC ANTONUCCI,                          :

                Petitioner.           :

                                            08 Cv. 529 (SAS)

        - v. -                          :           04 Cr. 828 (SAS)

UNITED STATES OF AMERICA,          :

                Respondent.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITIONER'S PETITION UNDER
28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
*Attorney for the United States
of America*

WILLIAM J. STELLMACH
Assistant United States Attorney
   - *Of Counsel* -

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Petitioner's Criminal Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1.    The PIHC Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        2.    The New Focus Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        3.    Evidence Tampering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    The Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.    The Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D.    The Plea Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    E.    Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.    The Presentence Investigation Report . . . . . . . . . . . . . . . . . . 9

        2.    Petitioner's Sentencing Submission . . . . . . . . . . . . . . . . . . . 10

        3.    Sentencing Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        4.    Restitution Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    Petitioner's Claims Are Procedurally Barred and Meritless . . . . . . . . . . . . . . . 13

    A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Section 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        2.    Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . 14

B.    Discussion ................................................ 16

    1.    Petitioner Waived Collateral Attack ...................... 16

        a.    Waiver in General ............................... 16

        b.    Petitioner's Waiver Was Knowing and Voluntary ....... 18

        c.    Petitioner's Waiver Was Not Predicated
            On Ineffective Assistance of Counsel ................. 20

    2.    Counsel Was Effective ................................ 24

        a.    This Court Properly Applied the 2001 Guidelines ....... 24

        b.    The Record Contradicts Petitioner's Claims ........... 26

        c.    Petitioner Suffered No Prejudice ..................... 30

II.    This Court Properly Ordered Restitution ........................... 31

Conclusion ................................................... 34

**<u>Exhibits</u>**

Plea Agreement dated May 2, 2005 .................... Exhibit A

Transcript of Plea Proceeding on May 19, 2005 ........... Exhibit B

Sentencing Submission of Petitioner ................... .Exhibit C

Transcript of Sentencing Proceeding on January 5, 2007 .... Exhibit D

Restitution Order issued April 30, 2007 ................ Exhibit E

Affidavit of Carl F. Schoeppl dated April 23, 2008 ........ .Exhibit F

Affidavit of Charles A. Ross dated April 23, 2008 ........ Exhibit G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - -x

DOMINIC ANTONUCCI,                    :

          Petitioner.                    :

                                 **08 Cv. 529 (SAS)**

          - v. -                    :    **04 Cr. 828 (SAS)**

UNITED STATES OF AMERICA,        :

          Respondent.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S MEMORANDUM OF LAW
## IN OPPOSITION TO PETITIONER'S PETITION UNDER
## 28 U.S.C. § 2255 TO VACATE, SET ASIDE OR CORRECT SENTENCE

### <u>PRELIMINARY STATEMENT</u>

The Government respectfully submits this memorandum of law in opposition to petitioner Dominic Antonucci's ("Petitioner") petition to vacate, set aside or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255 (the "Petition"). As an initial matter, the Petition is procedurally barred by the knowing and voluntary waiver in the Petitioner's plea agreement to precisely the collateral attack made here. Moreover, the Petition fails on its merits, and ignores the overwhelming evidence in the record belying Petitioner's claims, including his own statements. The Petition should therefore be denied.

## STATEMENT OF FACTS

### A.    Petitioner's Criminal Conduct

Petitioner was the president and part-owner of Platinum Investment Corporation ("Platinum"), a corrupt brokerage firm based in Rochester, New York. At Platinum, Petitioner orchestrated two frauds that cost victims more than $2.5 million: (1) a fraudulent private placement of securities for Platinum Investment Holding Corporation ("PIHC"), a shell company owned by the Petitioner and his family members. (PSR ¶¶ 29-37); and (2) a scheme involving New Focus Capital Partners ("New Focus"), a purported hedge fund managed by Platinum. (PSR ¶¶ 38-47).

### 1.    The PIHC Fraud

From November 2001 through August 2002, Petitioner used Platinum as a vehicle for the PIHC private placement fraud. According to two offering memoranda disseminated to investors, PIHC was raising funds to, among other things, acquire an equity stake in Platinum and other brokerage firms, and to provide additional funds for the research and development of a proprietary trading program called IntelliTrend XL. (PSR ¶¶ 29-31).

To raise funds for the private placement, Petitioner directed brokers falsely to advise investors that: (1) an initial public offering for PIHC was imminent, and would occur within anywhere from several weeks to several months; and (2) following that initial public offering, PIHC's shares would quickly rise to many multiples of the offering

share price. (PSR ¶ 35). Brokers then regularly solicited investment in PIHC by making these misrepresentations, and arbitrarily selecting IPO dates and price targets without any rational basis. In fact, the private placements were unregistered and Petitioner never took any steps preparatory to an IPO, such as retaining an underwriter or filing a prospectus.

In addition, the private placement memoranda expressly stated that commissions would not exceed 10 percent of the offering proceeds. (PSR ¶34(c)). In fact, Petitioner routinely misappropriated the proceeds, including to pay Platinum brokers kickbacks for sales of PIHC stock and their participation in the scheme. These kickbacks took the form of exorbitant 20 to 40 percent commissions that were never disclosed to PIHC investors. (PSR ¶¶ 36-37).

The PIHC scheme was successful. Between August 2001 and July 2002, Platinum raised more than $2 million in proceeds from more than seventy investors located across the United States. (PSR ¶ 31).

### 2.    The New Focus Fraud

Petitioner's second fraudulent scheme involved New Focus, a hedge fund operated by Platinum. In soliciting investment in New Focus, Petitioner directed Platinum's brokers to represent to potential investors that Platinum had developed proprietary trading software which had been trademarked as "IntelliTrend XL." (PSR ¶ 38). According to the brokers, New Focus invested in the stock market according to strategies dictated by IntelliTrend, which the brokers represented had generated returns

ranging from 3% to 5% per month. (PSR ¶ 41(b)). In fact, IntelliTrend was merely a commercially available trading program that Petitioner had purchased and labeled with a new name.

Contrary to representations to investors, however, New Focus had steadily lost money shortly after opening. (PSR ¶ 41). Beginning in July 2001, to conceal those trading losses, Platinum brokers, at Petitioner's direction, would periodically confer regarding fabricated rates of return to report to investors. (PSR ¶¶ 42-43). Following those discussions, brokers would ask the firm's trader to generate New Focus account statements for their customers. These account statements falsely represented that customers were earning money in New Focus, which was purportedly realizing between 0.6% to as much as 8% in profits each month. (PSR ¶ 42). To ensure consistency in reporting these false, inflated returns, Petitioner and his brokers regularly discussed and agreed upon a fabricated rate of return. (PSR ¶ 43).

In addition, Platinum brokers concealed their own personal trading losses at the expense of New Focus customers. (PSR ¶¶ 44-47). Platinum brokers had personal trading accounts which they had opened under Platinum's own master trading account at its clearing firm. To help the brokers avoid realizing losses in their personal trading accounts, the Platinum's chief trader, with Petitioner's approval, would cancel money-losing traders from a given broker's personal trading account and re-bill it to the New Focus trading account, thereby shifting the trading loss into the hedge fund and further

4

depressing its returns.  This cancel and re-billing practice was never disclosed to investors in New Focus.

Ultimately, the misrepresentations and bogus account statements fraudulently induced over thirty individuals to invest more than $700,000 into New Focus.  (PSR ¶ 40).

### 3.    Evidence Tampering

In addition to the fraudulent schemes described above, Petitioner also ordered and oversaw the destruction of incriminating evidence at Platinum's headquarters after he learned of an ongoing investigation by the United States Securities and Exchange Commission (the "SEC") into Platinum.  (PSR ¶¶ 48-53).  On July 19, 2002, the SEC requested documents from Petitioner and others at Platinum related to the PIHC private placements and New Focus.  Shortly thereafter, the SEC filed a civil complaint and obtained a temporary restraining order from the Hon. Jed S. Rakoff, United States District Court Judge for the Southern District of New York.  In August 2002, Petitioner directed Platinum's brokers and traders to destroy any documents that they did not want the SEC to see; at Petitioner's direction, his employees in fact destroyed both hard-copy and electronic records related to PIHC and New Focus.

### B.    The Indictment

On August 10, 2004, a grand jury in this District returned Indictment 04 Cr. 828 (SAS), charging Petitioner and six former Platinum brokers, including his younger

brother, in five counts.[1]

In connection with the PIHC private placement fraud, Count One charged the Petitioner with conspiracy to commit securities fraud, mail fraud, and wire fraud, in violation of Title 18, United States Code, Section 371, and Count Two charged securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5. In connection with the New Focus fraud, Count Three charged conspiracy to commit securities fraud, mail fraud, and wire fraud, in violation of Title 18, United States Code, Section 371, and Count Four charged securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5. Count Five charged tampering with evidence, in violation of Title 18, United States Code, Section 1512(c).

## C.    The Plea Agreement

On May 2, 2005, Petitioner entered into an agreement to plead guilty to Superseding Information S1 04 Cr. 828 (SAS), which charged him in four counts. A copy of the plea agreement is attached hereto as Exhibit A.

The principal difference between the Indictment and the Superseding Information was that the latter combined the PIHC and New Focus schemes into one conspiracy count. Count One charged him with conspiracy to commit securities fraud,

---

[1]    All defendants ultimately pled guilty, in addition to two other Platinum brokers who cooperated with the Government and pled out to separate Informations for their participation in the fraudulent schemes described above.

6

mail fraud, and wire fraud, in violation of Title 18, United States Code, Section 371, and

Count Two charged securities fraud, in violation of Title 15, United States Code, Sections

78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, in

connection with both the PIHC and New Focus schemes. Counts Two and Three charged

securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and

Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the PIHC

and New Focus schemes, respectively. Count Four charged tampering with evidence, in

violation of Title 18, United States Code, Section 1512(c).

   Among its terms, the Plea Agreement included a stipulation between the

parties regarding the proper calculation of the Guidelines range. <u>See</u> Plea Agreement

dated May 2, 2005 (Ex. A), 2-3. According to that stipulation, the applicable Guidelines

range was 108 to 135 months.

   The Plea Agreement, however, contained a typographical mistake,

incorrectly identifying § 2F1.1 as the applicable Guideline. In fact, the applicable

Guideline was § 2B1.1. The Sentencing Commission revised the fraud guideline in the

2001 edition of the Sentencing Guidelines, replacing § 2F1.1 as the applicable fraud

guideline with § 2B1.1. However, the stipulated calculation in the Plea Agreement,

including all relevant enhancements, were based on the 2001 Guidelines, i.e., § 2B1.1. In

fact, § 2B1.1 was expressly cited for the calculations of the base offense level, and

enhancements based on the loss amount and number of victims.

The parties further agreed that no departures from the stipulated Guidelines range of 108 to 135 months were warranted, but each reserved their right to seek a sentence outside of that range pursuant to the factors set forth in Title 18, United States Code, Section 3553(a).  In addition, Petitioner waived any right to appeal a sentence within that stipulated Guidelines range, or otherwise challenge any sentence within that stipulated range under Title 28, United States Code, Section 2255 and/or 2241.  See Plea Agreement (Ex. A), 4.

The agreement also expressly provided that the Guidelines stipulation was not binding on either the United States Probation Office or this Court: "neither [] Probation [] nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts." See id. (emphasis added).

Furthermore, the Plea Agreement contained a merger clause, stating that the agreement superseded "any prior understandings, promises, or conditions" between the parties, and that "[n]o additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement." See id., at 6.

**D.**     **Plea Proceeding**

On May 19, 2005, the Petitioner pled guilty before Magistrate Judge Gabriel W. Gorenstein.  A copy of the plea transcript is attached hereto as Exhibit B ("Plea Tr.").

8

At the outset, the Petitioner stated that no promises had been made to him apart from those contained in the Plea Agreement.  See Plea Tr. (Ex. B), 10.

Judge Gorenstein carefully allocuted the Petitioner regarding the Guidelines stipulation contained in the Plea Agreement:

> THE COURT:       In reviewing the agreement I notice it contains an analysis of how the government and your attorney believe the law of sentencing, which we refer to as sentencing guidelines, will impact on any prison term and states a conclusion that the range of sentence would be 108 to 135 months' imprisonment.  Do you understand that?
>
> PETITIONER:      Yes, Your Honor.
>
> THE COURT:       Do you understand that the sentencing judge is not bound by the analysis and is free to do her own analysis which could result in a different range?
>
> PETITIONER:      Yes, I do, Your Honor.

Plea Tr. (Ex. B), 11.

Petitioner also acknowledged that if Your Honor sentenced him to a term of imprisonment of 135 months or less, he was "giving up" his right "to complain about the sentence either through application to the trial court or appeal."  See Plea Tr. (Ex. B), 12.

On June 13, 2005, Your Honor accepted the Petitioner's guilty plea.

**E.    Sentencing**

**1.    The Presentence Investigation Report**

Prior to sentencing, the United States Probation Office (the "Probation

Office") prepared the PSR. Among other things, the PSR summarized the stipulated Guidelines range set forth in the Plea Agreement. See PSR, at 5. The Probation Office noted that the Plea Agreement in one sentence referenced § 2F1.1, but observed that "[t]his appears to be a typographical error. The applicable guideline section is § 2B1.1." PSR, at 5.

The Probation Office's own calculation of the applicable Guidelines was identical to that in the Plea Agreement and yielded a range of 108 to 135 months' imprisonment (PSR ¶¶ 60-74), and recommended a sentence of 108 months. See PSR, at 27-28.

### 2.    Petitioner's Sentencing Submission

In the sentencing submission made on Petitioner's behalf, defense counsel discussed the Plea Agreement, including the stipulation related to the applicability of the Guidelines and concluded that: "Mr. Antonucci's stipulated Guidelines range, pursuant to the 2001 Sentencing Guidelines is therefore from 108 to 135 months." See Antonucci Sentencing Memorandum dated November 2, 2006, a copy of which (without exhibits) is attached hereto as Exhibit C.

In that submission, counsel argued for a sentence below the stipulated Guidelines range based on the factors set forth in Title 18, United States Code, Section 3553(a). Specifically, counsel argued that Petitioner had demonstrated an extraordinary acceptance of responsibility by attempting to cooperate post-indictment with the United

States Attorney's Office in the Southern District of Florida in an unrelated investigation, and that a Guidelines sentence would result in an unwarranted sentencing disparity in comparison to his co-defendants. See id., at 15-17.

### 3. Sentencing Proceeding

At the outset of the sentencing proceeding held on January 5, 2007, this Court confirmed that both defense counsel and Petitioner had reviewed the PSR and had no objections. See Sentencing Transcript dated January 5, 2007 ("Sent. Tr."), 2-3. A copy of the sentencing transcript is attached hereto as Exhibit D.

Next, this Court meticulously reviewed and adopted the findings in the PSR, stating that the base offense level was based on § 2B1.1 of the Sentencing Guidelines, identifying each applicable enhancement, and concluding that the Guidelines yielded a range of 108 to 135 months' imprisonment, among other penalties. See Sent. Tr. (Ex. D), 3-5. At no time did either Petitioner or his counsel contest that the calculations were erroneous, much less that the 2001 Guidelines were inapplicable.

During the course of his own statements to the Court, Petitioner asserted that he had made "extraordinary charitable contributions" by assisting a nephew, and "also shown extraordinary ... rehabilitation" following his arrest. Sent. Tr. (Ex. D), 16-17. In attempting to minimize his conduct, Petitioner blamed misadvice of previous counsel in connection with the SEC investigation, and concluded that: "I've done good things all my life that could fill this room, that I've done a teacup of maybe bad things."

11

Sent. Tr. (Ex. D), 18.

Your Honor carefully reviewed each factor in 18 U.S.C. § 3553(a), as well as the arguments advanced by Petitioner. See Sent. Tr. (Ex. D), 22-24. This Court concluded that his request for a departure based on his purported substantial assistance in Florida was "simply mysterious," and found his remaining arguments "unpersuasive, at best, and disingenuous, at worst." Sent. Tr. (Ex. D), 25.

At the conclusion of the proceeding, Your Honor imposed a sentence of 108 months' imprisonment, to be followed by three years' supervised release, and also ordered the payment of $400 in special assessments with restitution to be imposed at a later date.

### 4.    Restitution Order

On April 30, 2007, Your Honor entered a restitution order directing Petitioner to pay $2,950,578.77, pursuant to a schedule submitted by the Government. That restitution figure was identical to the one calculated in the PSR, and restitution was ordered jointly and severally. Petitioner did not object at sentencing to this restitution amount in the PSR, nor did he ever challenge the identification of victims and their corresponding loss amounts. See Restitution Order dated April 30, 2007, a copy of which is attached hereto as Exhibit E.

## ARGUMENT

## POINT I

### Petitioner's Claims Are Procedurally Barred and Meritless

Petitioner's efforts to transform a typographical error in his Plea Agreement into constitutionally ineffective assistance of counsel are flatly belied by the record and the law.

As an initial matter, Petitioner made a knowing and voluntary waiver of his right to collaterally attack his conviction and sentence that, even accepting his self-serving claims, was not affected by the purported misadvice of counsel in connection with his plea. Nevertheless, even if his waiver were disregarded, the record overwhelmingly establishes that Petitioner was repeatedly informed at multiple stages of the plea and sentencing process that the Guidelines range—to which he stipulated in his plea agreement—was based on the 2001 Guidelines. That record, coupled with affidavits submitted by two defense lawyers involved in plea discussions with Petitioner, make clear that there is no factual basis for his claims. Moreover, Petitioner has made no showing of any prejudice arising from the alleged ineffective counsel. Regardless of any alleged representations by defense counsel or "misunderstanding" of his Plea Agreement, he was repeatedly advised that no agreement bound this Court, which at sentencing correctly applied the 2001 Guidelines. Thus, in addition to being procedurally barred, the Petition is legally and factually meritless.

13

## A.     Applicable Law

### 1.     Section 2255

Section 2255 allows a convicted person being held in federal custody to petition the sentencing court to vacate, set aside or correct a sentence. A properly filed motion under section 2255 must allege that: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose such sentence; (3) the sentence was in excess of the maximum authorized by law; or (4) the sentence is otherwise subject to collateral attack. See 28 U.S.C. § 2255. Accordingly, collateral relief under section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir.1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

### 2.     Ineffective Assistance of Counsel

The Sixth Amendment guarantees a fair trial and competent counsel in all criminal prosecutions. See U.S. Const. amend. VI. The Sixth Amendment "'stands as a constant admonition that if the constitutional safeguards it provides be lost, justice will not still be done.'" Gideon v. Wainwright, 372 U.S. 335, 343 (1963) (quoting Johnson v. Zerbst, 304 U.S. 458, 462 (1938)). To prove that counsel was constitutionally ineffective, a petitioner must satisfy the two-part test established in Strickland v. Washington, 466

14

U.S. 668, 687 (1984).  A petitioner must first show that his counsel's representation fell below "an objective standard of reasonableness" under "prevailing professional norms." Id. at 688.  The second prong requires a petitioner to "affirmatively prove prejudice," i.e., to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.

The Supreme Court has held "that the two-part Strickland v. Washington test applies to challenges to guilty pleas based on ineffective assistance of counsel." Hill v. Lockhart, 474 U.S. 52, 58 (1985).  To establish an ineffective assistance claim within the context of a guilty plea, a petitioner must show that his counsel's constitutionally ineffective performance affected the outcome of the plea process such that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial."  Id. at 59.  See also United States v. Coffin, 76 F.3d 494, 497 (2d Cir.1996) ("A defendant who pleads guilty unconditionally while represented by counsel may not assert independent claims relating to events occurring prior to the entry of the guilty plea. 'He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within [acceptable] standards.'" (quoting Tollett v. Henderson, 411 U.S. 258, 267 (1973) (alteration in original)).

**B.** **Discussion**

**1.** **Petitioner Waived Collateral Attack**

**a.** **Waiver in General**

Petitioner asserts that his sentence was improper because it should have been computed using § 2F1.1 in the 2000 Guidelines Manual, which he claims would have resulted in a sentencing range of 46 to 57 months. Specifically, Petitioner argues that his attorney was ineffective for failing to object that the plea agreement was "contradictory" because it referenced § 2F1.1 but then applied § 2B1.1, together with other applicable enhancements, from the 2001 Guidelines. See Br. 9-12. Petitioner argues that he had a "reasonable understanding" that the more favorable 2000 Guidelines would apply, and that "[a]t minimum, counsel's performance was deficient for advising the petitioner to sign a plea agreement containing contradictory provisions. But for counsel's deficient performance, there was a reasonable probability the outcome would have been different because there was a reasonable probability the 2000 Guidelines would have been applied." Br., 11-12.

As an initial matter, although Petitioner couches his argument in terms of ineffective assistance of counsel, it is actually a challenge to his sentence. Therefore, these arguments are foreclosed by the waiver provision contained in his Plea Agreement.[2]

---

[2] Petitioner understandably attempts to elude the waiver provision. There was nothing difficult or confusing about the waiver language contained in the Plea Agreement to suggest that Petitioner might not have understood its consequences. On the contrary, the waiver provision was explicit and straightforward.

See United States v. Djelevic, 161 F.3d 104, 107 (2d Cir.1998) (holding that a section 2255 petitioner may not avoid the effect of his forfeiture of collateral attack rights by "dress[ing] up" his sentencing challenges as purported violations of the Sixth Amendment).

The Second Circuit has "long enforced waivers of direct appeal rights in plea agreements." Garcia-Santos v. United States, 273 F.3d 506, 509 (2d Cir.2001). "The reasons for enforcing waivers of direct appeal ... lead ... to the same conclusion as to waivers of collateral attack under § 2255." Id. However, "a plea agreement containing a waiver of the right to appeal is not enforceable where the defendant claims that the plea agreement was entered into without effective assistance of counsel." United States v. Hernandez, 242 F.3d 110, 113-14 (2d Cir.2001) (per curiam). Similarly, although "[t]here is no general bar to a waiver of collateral attack rights in a plea agreement," such waivers are unenforceable where the asserted ground for challenging the sentence is ineffective assistance of counsel in connection with plea negotiations or the agreement itself.[3] Frederick v. Warden, Lewisburg Corr. Facility, 308 F.3d 192, 195 (2d Cir.2002) ("[A] waiver of appellate or collateral attack rights does not foreclose an attack on the validity of the process by which the waiver has been procured, here, the plea agreement."), cert. denied, 537 U .S. 1146 (2003).

Here, however, petitioner does not contend that the forfeiture of his right to

---

[3]    "The rationale is that 'the very product of the alleged ineffectiveness' cannot fairly be used to bar a claim of ineffective assistance of counsel." Hernandez, 242 F.3d at 114.

collaterally attack his sentence was itself somehow improper, either because the forfeiture was insufficiently knowing and voluntarily or because it was predicated upon ineffective assistance of counsel. Petitioner does not seek to withdraw his guilty plea, nor does he claim that his Plea Agreement was entered into involuntarily. From his accompanying memorandum of law, it is clear that Petitioner merely seeks to be re-sentenced pursuant to an earlier version of the Guidelines. See Br., 11, n.4 ("If it turns out that the prosecutor agreed with defense counsel to use the sentencing guidelines most favorable to Mr. Antonucci, then it would follow that Mr. Antonucci would be entitled to specific performance of the terms of the agreement with defense counsel.") Having received the benefit of the bargain embodied in his Plea Agreement, it would be inappropriate to permit Petitioner to unilaterally rescind a portion of that bargain, namely, his commitment to forego collaterally attacking any sentence within the stipulated sentencing range.

### b.    Petitioner's Waiver Was Knowing and Voluntary

A guilty plea must represent "a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). The voluntariness of a plea of guilty, however, should be determined by considering all of the relevant circumstances. See Brady v. United States, 397 U.S. 742, 749 (1970). Assuming Petitioner's attorney failed to adequately explain the Plea Agreement's waiver provision—a claim that Petitioner notably does not make—that

explanation was provided by Judge Gorenstein during the plea proceeding.  If Petitioner truly did not understand the consequences of his plea after his colloquy with the court, he should not have pled guilty.  By pleading guilty after a thorough and detailed allocution, Petitioner has foreclosed any claim that his waiver of appellate and collateral challenge rights was not knowing, intelligent and voluntary.

This conclusion is compelled by the Second Circuit's decision in Garcia-Santos.  In Garcia-Santos, the Second Circuit affirmed this Court's dismissal of a section 2255 motion, finding that "Garcia-Santos's plea agreement was entered into knowingly and voluntarily, and with awareness of his waiver of appeal and collateral attack."  Garcia-Santos, 273 F.3d at 508.  This Court dismissed the motion in Garcia-Santos on the ground that the petitioner pled guilty under a plea agreement in which he expressly agreed not to attack his sentence under section 2255 if he was sentenced within or below a stipulated range--and the sentence imposed was within that range.  See id.

The Second Circuit applied five factors in affirming Your Honor's dismissal. First, as in the instant case, the petitioner in Garcia-Santos signed the plea agreement. See id.  Second, the petitioner in Garcia-Santos  "stated to the magistrate judge that he had read and understood the plea agreement." Id.  Here, Petitioner made a similar statement to Judge Gorenstein.  See Plea Tr. (Ex B), 10.  Third, the Garcia-Santos petitioner "did not attempt to appeal his sentence, even though he had been told by the

19

sentencing judge that he had the right to appeal." <u>Garcia-Santos</u>, 273 F.3d at 508. Here, no appeal was taken even though Your Honor advised petitioner at sentencing that he had a right to appeal. <u>See</u> Sentencing Tr. (Ex. D), 31. Fourth, in <u>Garcia-Santos</u>, the petitioner "did not claim, in his § 2255 motion, that he had not understood the waiver contained in his plea agreement," <u>Garcia-Santos</u>, 273 F.3d at 508, and no such claim is made here by Petitioner.[4]

Application of the <u>Garcia-Santos</u> factors supports dismissal of the instant motion. Accordingly, the Plea Agreement, and its waiver of appeal and collateral attack rights, cannot be vitiated on grounds that it was not knowing and voluntary.

### c.    Petitioner's Waiver Was Not Predicated on Ineffective Counsel

At no point does Petitioner assert that he entered into the Plea Agreement without the benefit of effective assistance of counsel. The closest Petitioner arguably comes to pressing such a claim is his assertion that his attorney told him that he would be sentenced under the 2000 Guidelines. <u>See</u> Pet. Mem., 10-11.

Assuming that this assertion can be construed as an argument that the Plea Agreement was entered into without the benefit of effective assistance of counsel, it is plainly unavailing. Even if Petitioner's attorney made the above statement—and he has

---

[4]    In <u>Garcia-Santos</u>, there was also a fifth factor regarding petitioner's motion for reconsideration of the court's denial of his section 2255 motion. The motion for reconsideration was denied and the Second Circuit noted that "even in his petition for reconsideration, [the petitioner] did not assert explicitly or under oath that at the time of his plea he did not understand that he was giving up his right to appeal and petition under § 2255." <u>Garcia-Santos</u>, 273 F.3d at 508. This fifth factor is not applicable here as petitioner did not file a motion for reconsideration.

20

submitted an affidavit unequivocally stating that he did not—there is no evidence that the

statement was made prior to the execution of the Plea Agreement such that Petitioner's

waiver of his rights was somehow predicated on it. Furthermore, any suggestion from

Petitioner that he relied upon his attorney's advice that he would not receive a longer

sentence based upon the purported application of the 2000 Guidelines is flatly

contradicted by a number of statements made by Petitioner in open court.

> For example, at his plea allocution, the following colloquy ensued:

| | |
|---|---|
| THE COURT: | I have a copy, I have the original of a letter dated May 2 from the United States Attorney's Office to your attorney that contains the plea agreement. Are you familiar with this letter? |
| PETITIONER: | Yes, I am, Your Honor. |
| THE COURT: | Apart from what's contained in the letter have any promises been made to you about the sentence you will receive? |
| PETITIONER: | No, Your Honor. |
| THE COURT: | Do you understand that the decision as to the appropriate sentence will be entirely up to the sentencing judge? |
| PETITIONER: | I do, Your Honor. |
| THE COURT: | Do you understand in exercising her discretion, she will be limited only by what the law requires? |
| PETITIONER: | Yes, Your Honor. |
| THE COURT: | Do you understand that even if you were surprised or disappointed by your sentence, you will nonetheless be |

<u>bound by your guilty plea</u>?

PETITIONER:      <u>Yes, Your Honor</u>.

Plea Tr. (Ex. B), 10-11 (emphasis added).

This statement belies Petitioner's current statement that his lawyer advised him that his sentencing range was 46 to 57 months based on a separate agreement between the Government and his lawyer.  <u>See</u> Antonucci Aff., ¶¶ 2-3.  Petitioner told the Court that no promises were made to him beyond those set forth in the Plea Agreement. This statement necessarily excludes the possibility that Petitioner's attorney represented that any side agreement with the Government regarding the Guidelines applied.

In addition, Petitioner made the following statements regarding the stipulated Guidelines range in the Plea Agreement:

THE COURT:      In reviewing the agreement I notice it contains an analysis of how the government and your attorney believe the law of sentencing, which we refer to as Sentencing Guidelines, will impact on any prison term and states a conclusion that the range of sentence would be 108 to 135 months' imprisonment.  Do you understand that?

PETITIONER:      Yes, Your Honor.

THE COURT:      <u>Do you understand the sentencing judge is not bound by the analysis and is free to do her own analysis which could result in a different range</u>?

PETITIONER:      <u>Yes, I do, Your Honor</u>.

THE COURT:      Do you understand that no matter what range the sentencing judge comes to, there are certain

22

|  | circumstances under which she could depart by going below or above that range? |
|---|---|
| PETITIONER: | Yes, Your Honor. |
| THE COURT: | Do you understand under the terms of this agreement if you are sentenced to a prison term that is no greater than 135 months, you are giving up your right to complain about the sentence either through application to the trial court or appeal; do you understand that? |
| PETITIONER: | Yes, Your Honor. |

Plea Tr. (Ex. B), 11-12 (emphasis added). These statements negate any claim that Petitioner was acting in reliance upon his attorney's alleged assurance that the actual sentencing range that he was facing was far below that stipulated to in his Plea Agreement, or that any agreement would somehow bind this Court at sentencing.

In these circumstances, the claim that Petitioner received ineffective assistance of counsel in connection with the plea process can be summarily dismissed. Petitioner simply cannot carry his burden of showing ineffectiveness of counsel on the basis of a self-serving, post hoc assertion that contradicts a number of his sworn, in-court statements. As the Supreme Court held in the collateral attack context: "[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Blackledge v. Allison, 431 U.S. 63, 74 (1977) (emphasis added).

In sum, Petitioner's Plea Agreement, and its waiver of appellate and

collateral attack rights, was entered into knowingly and voluntarily by Petitioner. Nor did Petitioner receive ineffective assistance of counsel with regard to the plea process and the resulting Plea Agreement. Accordingly, Petitioner's ineffective assistance claim is, in effect, a challenge to his sentence foreclosed by the waiver provision contained in his Plea Agreement.[5]

### 2.    Counsel Was Effective

Even if the claims were not procedurally barred, the Petition fails on the merits. Examined against the record of Petitioner's Plea Agreement and his own statements during both his plea and again at sentencing, together with affidavits from two attorneys contradicting his claims, Petitioner's claims concerning his understanding of the applicable Guidelines and assurances by defense counsel are wholly incredible.

### a.    This Court Properly Applied the 2001 Guidelines

As an initial matter, this Court properly concluded that the 2001 Guidelines Manual was the appropriate manual in this case. Section 1B1.11 of the Sentencing Guidelines instructs a district court to "use the Guidelines Manual in effect on the date that the defendant is sentenced," unless to do so would violate the ex post facto clause of the Constitution. U.S.S.G. § 1B1.11(a). In that circumstance, the district court should employ the "Guidelines Manual in effect on the date that the offense of conviction was

---

[5]    Petitioner's complaint that his counsel was ineffective for advising him not to appeal or collaterally attack his sentence is thus baseless since the waiver was knowing and voluntary, and unaffected by even the purported ineffective claims raised in the Petition.

committed." U.S.S.G. § 1B1.11(b)(1) (emphasis added).  If a defendant is convicted of an offense that "straddles" two different Guidelines Manuals, as here, the later manual is to be used.  See U.S.S.G. § 1B1.11(b)(2) & (3).

Petitioner's claim that the 2000 Guidelines applied to his case because the "fraudulent scheme was executed prior to November 1, 2001 although the misappropriation of funds occurred after November 1, 2001" is simply wrong.  Br., 11. The Superseding Information expressly alleged that the PIHC scheme occurred from November 2001 through August 2002, the New Focus scheme took place from July 2001 through August 2002, and the evidence tampering took place in August 2002.  Moreover, each of these schemes was not "executed" prior to November 1, 2001.  As Petitioner allocuted, the PIHC private placement fraud and New Focus scheme necessarily involved continuing misrepresentations to investors and misappropriation of funds.  Platinum brokers continued to solicit investment in both schemes until the firm folded in the face of the SEC's investigation during August 2002, and disseminated materially false and misleading documents in furtherance of both schemes until the end.  In addition, the destruction of incriminating evidence, which was clearly designed to conceal both frauds, irrefutably took place in August 2002.

United States v. Kilkenny, 493 F.3d 122 (2d Cir. 2007), upon which Petitioner heavily relies, supports the Government's position.  Kilkenny obtained funds from a bank through a fraudulent loan application.  The Second Circuit found that the

25

bank fraud was completed when he received the funds, and was not continued by Kilkenny's failure to repay the loan. See id., at 130. Here, by contrast, the fraudulent inducement of investment and systematic misappropriation of funds persisted well past the effective date of the 2001 Guidelines.

In sum, because Petitioner's conduct extended well past the effective date of the 2001 Guidelines Manual, no other Guidelines could have applied. This Court therefore correctly calculated the Guidelines range at sentencing.

### b.    The Record Contradicts Petitioner's Claims

Petitioner's claims about his counsel's purported representations regarding the Sentencing Guidelines are flatly belied by the record. The Petition rests entirely on a single typographical mistake in the Plea Agreement that, in the context of that agreement, let alone the entire record, is clearly a mistake. Indeed, the overwhelming evidence in the record, including Petitioner's own statements and sworn affidavits from his defense counsel, are fatal to his claims.

As described above, the Plea Agreement contains exactly one reference to § 2F1.1, the applicable fraud guideline in the 2000 Guidelines Manual. It is apparent on the face of the document, let alone from subsequent events, that this was merely a scrivener's error. Immediately following that single reference, the Plea Agreement contains numerous references to § 2B1.1 with enhancements that are not contained in the 2000 Guidelines Manual. For example, the Plea Agreement provides that base offense

26

level governing the offense is six, pursuant to § 2B1.1(a), U.S.S.G. <u>See</u> Plea Agreement (Ex. A), 2. Next, the Plea Agreement provides that, because the loss amount exceeded $1 million but did not exceed $2.5 million, the base offense level is increased by sixteen offense levels, pursuant to § 2B1.1(b), U.S.S.G. The Plea Agreement provides for an additional four-level enhancement because the offense involved more than fifty victims, pursuant to § 2B1.1(b)(2)(B), U.S.S.G.—an enhancement that did not exist in the 2000 Guidelines Manual. That calculation, with additional enhancements, yielded a Guidelines range of 108 to 135 months. <u>See</u> <u>id.</u>, 3. Standing alone, these repeated references to § 2B1.1, coupled with a Guidelines sentencing range incompatible with the 2000 Guidelines Manual, is fatal to Petitioner's claim about "ambiguity" in the Plea Agreement. <u>See</u> Br., 10. That Petitioner stipulated to the reasonableness of that range, while believing it did not apply, is preposterous.

Indeed, as discussed above, he was carefully allocuted during his plea proceeding regarding the Plea Agreement, and unequivocally stated that there were no other agreements or promises made to him regarding sentencing other than those contained in that agreement. <u>See</u> <u>supra</u> p. 21. In addition, he acknowledged understanding that the parties' stipulation regarding the application of the Guidelines to his case did not bind this Court, and that, at sentencing, Your Honor was free to perform your own analysis, which could result in a different range. <u>See</u> <u>supra</u> pp. 21-23.

Finally, in connection with sentencing, Petitioner made a number of

27

statements that cannot be reconciled with his current assertions. The PSR explicitly noted that the reference in the Plea Agreement referred to § 2F1.1, but that "[t]his appears to be a typographical error. The applicable guideline section is § 2B1.1." PSR, at 5. Furthermore, the PSR's calculation of the Guidelines and applicable sentencing range mirrored that in the Plea Agreement, including the citations to § 2B1.1. At sentencing, Petitioner never expressed any concerns about that calculation, or his belief that any other sentencing range applied. Indeed, Petitioner's own sentencing submission conceded the Guidelines calculation but argued for credit for attempted cooperation in an ongoing federal investigation in Florida. When addressing this Court at length, Petitioner again failed to allude to any dispute concerning the Guidelines calculation that Your Honor had adopted at the outset of sentencing. The record is thus clear that Petitioner was advised at multiple times which set of Guidelines governed his case and exactly how they applied.

In addition to the clear weight of the record, the two attorneys referenced in Petitioner's supporting affidavit have submitted their own sworn statements that completely contradict Petitioner claims. Contrary to Petitioner's claims, Mr. Schoeppl, his defense counsel throughout the case, confirms that he never advised Petitioner that the 2000 Guidelines Manual applied, or suggested to Petitioner that he had any agreement with the Government regarding the Guidelines calculation beyond that in the Plea Agreement. See Affidavit of Carl F. Schoeppl dated April 23, 2008 ("Schoeppl Aff."), a copy of which is attached hereto as Exhibit F. Mr. Schoeppl unambiguously states that "I

28

never stated or suggested in any way whatsoever that any sentencing range applied in Mr. Antonucci's case other than the stipulated 108 to 135 month range, or that there were any agreements with the Government other than those contained in the actual plea agreement." See Schoeppl Aff. (Ex. F), ¶ 7. Indeed, Mr. Schoeppl attests that he reviewed the Plea Agreement with Petitioner "in detail," and specifically explained that the 2001 Guidelines applied. See id., ¶ 6. Similarly, Petitioner's claims that Charles A. Ross, the lawyer representing his brother, also assured him that Your Honor did not consider the Guidelines or apply enhancements at sentencing is likewise contradicted by Mr. Ross' affidavit, a copy of which is attached hereto as Exhibit G.

United States v. Gebbie, 294 F.3d 540 (3d Cir. 2002), upon which Petitioner mistakenly relies, is instructive. In Gebbie, the plea agreement contained a material ambiguity: it provided that, in exchange for his guilty plea, the defendant would not be further prosecuted by federal prosecutors in the Northern or Southern Districts of Ohio for a conspiracy count, which was dismissed, but stated that he could be prosecuted for other crimes which the "United States" discovered by independent investigation. Id., at 545-46. Gebbie was then subsequently prosecuted in the Western District of Pennsylvania for precisely the same conspiracy which the Ohio prosecutors had dismissed. The ambiguity was thus whether "United States" encompassed all federal prosecutors, or only the Ohio offices which were parties to the plea agreement. The court then noted that when "faced with an ambiguous plea agreement, we must look to extrinsic

29

evidence that may evince the parties' intent," which it found actually compounded the ambiguity, and ultimately drew an inference against the drafting Government. Id., at 551.

For the reasons above, there is no such ambiguity here in light of the rest of the Plea Agreement. In any event, the "extrinsic evidence" here—including Petitioner's own subsequent in-court statements and allocutions, corroborated further by affidavits from two defense counsel—confirm that the parties' consistently agreed that the 2001 Guidelines Manual governed this case, and that Petitioner's self-serving, conclusory assertions to the contrary are disingenuous. Petitioner has clearly failed to show that his counsel was ineffective, and the Petition should therefore be dismissed.

### 3.    Petitioner Suffered No Prejudice

Even assuming that Petitioner could show that his counsel misadvised him regarding the Sentencing Guidelines, however, Petitioner has offered no objective evidence to prove that "the result of the proceeding would have been different" absent counsel's purported dereliction, and therefore Petitioner has failed to prove prejudice. Strickland, 466 U.S. at 693-94. As explained above, the 2001 Guidelines applied at sentencing based on the conduct to which Petitioner pled guilty. Regardless of whatever Petitioner's counsel allegedly told him about the 2000 Guidelines Manual or any supposed side agreement with the Government, the Probation Office and this Court were not bound to do anything other than calculate the sentencing range based on the applicable Guideline. No typographical error in the Plea Agreement or purported

conversation with defense counsel affects that calculation.

Thus, because Petitioner has failed to show any reasonable probability that the outcome would have been different, *i.e.*, that he would have been sentenced to something other than stipulated Guidelines range, he has failed to prove prejudice and thus failed to satisfy the second prong of Strickland.

## POINT II

### This Court Properly Ordered Restitution

Petitioner next asserts that this Court improperly ordered restitution because (1) it accepted "without proof" the information set forth in the Government's proposed restitution order, and (2) it ordered restitution in violation of 18 U.S.C. § 3664(f)(2), which requires that a sentencing court specify "the manner in which, and the schedule according to which, restitution is to be paid," with reference to the "financial resources and other assets of the defendant, including whether any of these assets are jointly controlled"; the "projected earnings and other income of the defendant"; and "any financial obligations of the defendant including obligations to dependents." Br., 15. Those claims are meritless.

First, in determining restitution, this Court scrupulously complied with its obligations to arrive at an accurate and complete calculation of compensable loss. Petitioner was offered ample opportunity at both his sentencing and again prior to imposition of restitution to contest the $2.8 million in restitution recommended in the

31

PSR, but he did not.  The law requires nothing more, much less an actual hearing.

At sentencing, the district court enjoys broad discretion to determine the procedure by which disputed issues at sentencing will be resolved, so long as it "'afford[s] the defendant some opportunity to rebut the Government's allegations.'" United States v. Slevin, 106 F.3d 1086, 1091 (2d Cir. 1996).  Even when facts pertaining to sentencing are contested, a trial court is "not required under the due process clause or the Guidelines to hold a full-blown evidentiary hearing," United States v. Olvera, 954 F.2d 788, 792 (2d Cir. 1992), see also United States v. Zagari, 111 F.3d 307, 330 (2d Cir. 1997), but may alternatively afford the defendant an opportunity to be heard by means of "affidavits, letters or other writings, argument and comment directed to the court, [or] cross-examination of witnesses."  United States v. Prescott, 920 F.2d 139, 143 ( 2d Cir. 1990).  Moreover, at sentencing, a district court is entitled to rely upon "any information known to it," United States v. Concepcion, 983 F.2d 369, 388 ( 2d Cir. 1992).  See also U.S.S.G. 6A1.3, comment. (at sentencing, "any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy").

Here, Petitioner had approximately four months within which to make any objections to the restitution figure recommended in the PSR; he did not.  The information upon which this Court relied, consisting of bank records and victim interviews, was reliable and uncontested.  There was thus no factual basis to contest either the restitution figure or the procedure by which it was ordered, and Petitioner was in any event afforded

32

an ample opportunity to be heard.

Second, this Court properly ordered restitution pursuant to 18 U.S.C. § 3664(f)(2). The PSR expressly recommended that Petitioner make restitution in the amount of $2.8 million to the victims in the attached list, and noted that the statutory factors had been considered.[6] See PSR, at 29. Moreover, the recommendation provided that restitution be paid in monthly installments of 10% of gross monthly income over a period of supervision to commence 30 days after the date of either judgment or release. See id. At sentencing, without objection, this Court adopted the PSR's findings and ordered restitution in an amount to be determined. See Sent. Tr. (Ex. D), 2-3, 26-27. Accordingly, this Court fully complied with its obligations pursuant to Section 3664(f)(2).[7]

---

[6]    Contrary to Petitioner's suggestion, the plain language of Section 3664(f)(2) shows that a sentencing court is not required expressly to articulate consideration of each statutory factor. Indeed, in United States v. Walker, 353 F.3d 130, (2d Cir. 2003), which Petitioner mistakenly relies on, a defendant appealed a restitution order entered by Your Honor using the same argument advanced by Petitioner and it was squarely rejected. Indeed, the Second Circuit explicitly "abandoned" the requirement that sentencing judges state on the record that they have considered the statutory factors. See id., at 133-34.

[7]    To the extent that Petitioner may contend that there is ambiguity in the record, the authority in this Circuit is that "[a] district court may properly order a schedule of restitution payments either by remaining silent as to the timing of payment, which would make such payment due in full 'immediately,' 18 U.S.C. § 3572(d)(1), or by setting forth a clear schedule." United States v. Nucci, 364 F.3d 419, 422 (2d Cir. 2004). If Petitioner is arguing that the record regarding schedules of payment is unclear, such ambiguity would be construed in favor of immediate payment of restitution.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that this Court deny the Petition.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:    _William J. Stellmach_

William J. Stellmach
Assistant United States Attorney
Telephone: (212) 637-2101

34

## <u>CERTIFICATE OF SERVICE</u>

MATTHEW CONRAD deposes and says that he is employed in the Office

of the United States Attorney for the Southern District of New York, and

That on May 1, 2008, he caused a copy of the attached Government's

Memorandum of Law in Opposition to Petitioner's Petition under 28 U.S.C. § 2255 to

Vacate, Set Aside or Correct Sentence to be served by Federal Express on:

> Cheryl J. Sturm
> 387 Ring Road
> Chadds Ford, PA 19317
> Tel: (484) 771-2000

I declare under penalty of perjury that the foregoing is true and correct,

pursuant to Title 28, United States Code, Section 1746.

MATTHEW CONRAD

Executed on: May 1, 2008
           New York, New York

EXHBIT A



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 2, 2005

Carl F. Schoeppl, Esq.
Schoeppl & Burke, P.A.
4651 North Federal Highway
Boca Raton, Florida 33431-5133

Re: Dominic Antonucci

Dear Mr. Schoeppl:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Dominic Antonucci ("the defendant") to a four-count criminal Information (the "Information").

Count One charges the defendant with conspiracy to commit securities fraud, mail fraud and wire fraud, in violation of Title 18, United States Code, Sections 371, 1341, 1343, and 1346, Title 15, United States Code, 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5. Count One carries a maximum sentence of five years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.

Count Two charges the defendant with securities fraud, in violation of Title 15, United States Code, 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the sale of securities issued by Platinum Investment Holding Corporation. Count Two carries a maximum sentence of twenty years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571 of the greatest of $5,000,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.

02.01.05

Count Three charges the defendant with securities fraud, in violation of Title 15, United States Code, 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, in connection with the sale of securities issued by New Focus Capital Partners. Count Three carries a maximum sentence of twenty years' imprisonment; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 15, United States Code, Section 78ff and Title 18, United States Code, Section 3571 of the greatest of $5,000,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.

Count Four charges the defendant with tampering with evidence, in violation of Title 18, United States Code, Sections 1512(c) and 2. Count Four carries a maximum sentence of twenty years; a maximum term of three years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, or twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense; and a mandatory special assessment of $100.

In addition to the foregoing, the Court must order restitution in accordance with Sections 3663, 3663A and 3664 of Title 18, United States Code.

In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations as to which this Office cannot, and does not, make any agreement) for his participation in the conduct charged in Indictment 04 Cr. 868 (SAS). In addition, at the time of sentencing, the Government will move to dismiss Indictment 04 Cr. 868 (SAS) against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

In consideration of the foregoing and pursuant to Sentencing Guidelines Section 6B1.4, the parties hereby stipulate to the following:

A.    Offense Level

1.    Under Appendix A of the Sentencing Guidelines, § 2F1.1, U.S.S.G., is applicable to the offenses charged in Counts One through Four of the Information, which Counts are grouped pursuant to § 3D1.2(c).

2.    Pursuant to § 2B1.1(a), U.S.S.G., the base offense level is 6.

3.    Pursuant to § 2B1.1(b), U.S.S.G., because the loss amount exceeded $1,000,000 but did not exceed $2,500,000, the base offense level is increased by 16 levels.

4.    Pursuant to § 2B1.1(b)(2)(B), U.S.S.G., because the offense involved more

02.01.05

than fifty victims, the base offense level is further increased by 4 levels.

       5.     Pursuant to § 3B1.3, U.S.S.G., because the offense involved an abuse of a position of trust, the base offense level is further increased by 2 levels.

       6.     Pursuant to § 3C1.1, U.S.S.G., because the offense involved obstruction of justice, the base offense level is increased further by 2 levels.

       7.     Pursuant to § 3B1.1, U.S.S.G., because the defendant acted as the organizer of criminal conduct involving five or more participants, the base offense level is further increased by 4 levels.

       8.     Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to § 3E1.1(a), U.S.S.G. Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, an additional 1-level reduction is warranted, pursuant to § 3E1.1(b), U.S.S.G, because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

       In accordance with the above, the applicable Guidelines offense level is 31.

    **B.**    <u>Criminal History Category</u>

       Based upon the information now available to this Office (including representations by the defense), the defendant has no criminal history points.

       In accordance with the above, the defendant's Criminal History Category is I.

    **C.**    <u>Sentencing Range</u>

       Based upon the calculations set forth above, the defendant's stipulated sentencing Guidelines range is 108 to 135 months (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to §5E1.2. At Guidelines level 31, the applicable fine range is $15,000 to $150,000.

       The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek such a departure or seek any adjustment not set forth herein. Nor will either party suggest that the Probation Department consider such a departure or adjustment, or suggest that the Court *sua sponte* consider such a departure or adjustment.

02.01.05                               3

The parties further agree that a sentence within the Stipulated Guidelines range would constitute a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a). However, the parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range, suggest that the Probation Department consider a sentence outside of the Stipulated Guidelines Range, and suggest that the Court *sua sponte* consider a sentence outside of the Stipulated Guidelines Range, based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a).

Except as provided in any written Proffer Agreement that may have been entered into between this Office and the defendant, nothing in this agreement limits the right of the parties (i) to present to the Probation Department or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Sentencing range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above. Nothing in this agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. §3E1.1, and/or imposition of an adjustment for obstruction of justice, *see* U.S.S.G. §3C1.1, regardless of any stipulation set forth above, should the defendant move to withdraw his guilty plea once it is entered, or should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this agreement.

It is understood that pursuant to Sentencing Guidelines § 6B1.4(d), neither the Probation Department nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Department or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is understood that the Sentencing Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Guidelines Range set forth above and (ii) that the Government will not appeal any

sentence within or above the Stipulated Guidelines Range. It is further agreed that any sentence within the Stipulated Guidelines range is reasonable. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

By entering this plea of guilty, the defendant also waives any and all right the defendant may have, pursuant to 18 U.S.C. §3600, to require DNA testing of any physical evidence in the possession of the Government. The defendant fully understands that, as a result of this waiver, any physical evidence in this case will not be preserved by the Government and will therefore not be available for DNA testing in the future.

It is further agreed that should the conviction following defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

02.01.05

5

Apart from any written Proffer Agreement that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

DAVID N. KELLEY
United States Attorney

By: _____

William J. Stellmach
Special Assistant United States Attorney
(212) 637-2101

APPROVED:

_____

David C. Esseks
Chief, Securities and Commodities
Fraud Task Force

AGREED AND CONSENTED TO:

_____        5-19-05
DOMINIC ANTONUCCI                  _____
                                   DATE

APPROVED:

_____        05/19/05
CARL F. SCHOEPPL                   _____
Attorney for Dominic Antonucci     DATE

02.01.05                    6

EXHBIT B

55J4ANTP

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA

4          v.               05CR828(SAS)(GWG)

5   DOMINIC ANTONUCCI,

6          Defendant.

7   ------------------------------x

8                          New York, NY
                          May 19, 2005
9                          11:15 a.m.

10   Before:

11               HON. GABRIEL W. GORENSTEIN

12                            Magistrate Judge

13                    APPEARANCES

14   DAVID N. KELLEY
         United States Attorney for the
15         Southern District of New York
   BILL STELLMACH
16   DAVID SIEGAL
         Assistant United States Attorneys
17

18   CARL SCHOEPPL
         Attorney for Defendant

19

20

21

22

23

24

25

55J4ANTP

1              (Case called)

2              THE COURT:  Before we start, I have before me a

3    consent to proceed before a United States magistrate judge.

4    Knowing you have the right to have your plea taken by a United

5    States district judge, you are agreeing to have it taken by a

6    United States magistrate judge, is that correct?

7              THE DEFENDANT:  Yes, your Honor.

8              THE COURT:  Has there been a waiver of indictment or

9    not.

10             MR. STELLMACH:  I think there is; I think Mr. Schoeppl

11   has the waiver.

12             THE COURT:  So long as it has already occurred I

13   don't, need proof.

14             MR. STELLMACH:  Yes.

15             THE COURT:  Was he asked the questions normally asked.

16             MR. STELLMACH:  No, your Honor, I believe he just

17   signed the actual waiver.

18             THE COURT:  That's what I am trying to get at.

19             MR. SCHOEPPL:  I don't believe I have the actual

20   waiver with me.  He can sign one now.

21             THE COURT:  Let's take care of it.

22             MR. SCHOEPPL:  Your Honor, I do have it with me.  If I

23   can approach, I have had the client sign the waiver of

24   indictment.  It is not witnessed; he did it in open court.

25             THE COURT:  My clerk witnesses it.  I will have her

55J4ANTP

1   orally take the waiver of the indictment.

2           THE DEPUTY CLERK:  Are you Dominic Antonucci?

3           THE DEFENDANT:  Yes.

4           THE DEPUTY CLERK:  You signed this waiver of

5   indictment?

6           THE DEFENDANT:  Yes.

7           THE DEPUTY CLERK:  Before you signed it, did you

8   discuss it with your attorney?

9           THE DEFENDANT:  Yes.

10          THE DEPUTY CLERK:  Did your attorney explain what it

11  means to waive indictment?

12          THE DEFENDANT:  Yes.

13          THE DEPUTY CLERK:  Do you understand that you are

14  under no obligation to waive indictment?

15          THE DEFENDANT:  Yes.

16          THE DEPUTY CLERK:  Do you know what a grand jury is?

17          THE DEFENDANT:  Yes.

18          THE DEPUTY CLERK:  Do you understand that if you

19  choose not no waive indictment, the government would have to

20  present their case to a grand jury which may or may not indict

21  you?

22          THE DEFENDANT:  Yes.

23          THE DEPUTY CLERK:  Do you realize by signing this

24  waiver of indictment you have given up your right to have this

25  case presented to a grand jury?

55J4ANTP

1          THE DEFENDANT:  Yes.

2          THE DEPUTY CLERK:  Have you seen a copy of the

3     information?

4          THE DEFENDANT:  Yes.

5          THE DEPUTY CLERK:  Do you wish me to read the

6     information to you now in open court?

7          THE DEFENDANT:  No.

8          (Defendant sworn)

9          THE COURT:  Now that you are under oath, do you

10    understand that any statement you give me here could be used

11    against you in a prosecution for perjury or for making a false

12    statement?

13         THE DEFENDANT:  I do, your Honor.

14         THE COURT:  What's your full name?

15         THE DEFENDANT:  Dominic Antonucci.

16         THE COURT:  What is your age?

17         THE DEFENDANT:  38.

18         THE COURT:  Are you a United States citizen?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Are you able to read and write English?

21         THE DEFENDANT:  Yes, your Honor.

22         THE COURT:  What is the extent your formal education.

23         THE DEFENDANT:  12 years of high school and 3 years of

24    college.

25         THE COURT:  Are you now or have you recently been

5

55J4ANTP

1    under the care of a doctor or psychiatrist for any reason?

2            THE DEFENDANT:  No, your Honor.

3            THE COURT:  Have you ever been hospitalized in the

4    past for mental illness?

5            THE DEFENDANT:  No, your Honor.

6            THE COURT:  Alcoholism?

7            THE DEFENDANT:  No.

8            THE COURT:  Narcotics addiction?

9            THE DEFENDANT:  No, your Honor.

10            THE COURT:  As you stand here today are you under the

11    influence of any mind-altering drug or alcoholic drink?

12            THE DEFENDANT:  No, your Honor.

13            THE COURT:  Have you been able to understand

14    everything that has been said to you today?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  For the record, on the basis of the

17    defendant's responses to my questions and my observations of

18    his demeanor, I find that he is fully competent to enter an

19    informed plea at this time.

20            Have you seen a copy of the charges against you in the

21    case contained in the document we call an information?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  Have you had a chance to read the

24    information?

25            THE DEFENDANT:  Yes, your Honor.

55J4ANTP

1          THE COURT:  Do you understand what it says you did?

2          THE DEFENDANT:  Yes, your Honor.

3          THE COURT:  Have you had a chance to discuss the

4  charges and how you wish to plead with your attorney?

5          THE DEFENDANT:  Yes, I have, your Honor.

6          THE COURT:  Are you satisfied with your attorney's

7  representation?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  Bearing in mind Count 1 charges you with

10 conspiracy to commit securities fraud, mail fraud, and wire

11 fraud, how do you wish to plead?

12         THE DEFENDANT:  I plead guilty, your Honor.

13         THE COURT:  Bearing in mind Count 2 charges you with

14 securities fraud, how do you wish to plead to that charge?

15         THE DEFENDANT:  I plead guilty, your Honor.

16         THE COURT:  Bearing in mind that Count 3 charges you

17 with securities fraud, as well as the first count having been

18 in connection with Platinum Investment Holding Corporation, and

19 Count 3, in connection with New Focus Capital Partners, how do

20 you wish to plead to Count 3?

21         THE DEFENDANT:  I plead guilty, your Honor.

22         THE COURT:  Count 4 charges you with tampering with

23 evidence.  How do you wish to plead to that count?

24         THE DEFENDANT:  I plead guilty, your Honor.

25         THE COURT:  Because you are proposing to enter a

55J4ANTP

1    guilty plea, I need to ask you some additional questions.

2    First, as we already said Count 1 charges you with conspiracy

3    to commit securities fraud, mail fraud and wire fraud.

4    Allegedly this occurred between November 2001 and August 2002.

5    This carries a maximum sentence of five years' imprisonment, a

6    maximum term of three years' supervised release, a maximum fine

7    of $250,000 or twice what was gained from the offense or twice

8    what was lost by someone other than yourself as a result of the

9    offense, and also a $100 special assessment.  Do you understand

10   these maximum penalties I just described to you?

11              THE DEFENDANT:  Yes, your Honor.

12              THE COURT:  Count 2 charges you with securities fraud

13   in connection with Platinum Investment Holding Corporation, the

14   maximum sentence on this count is two years' imprisonment, also

15   a maximum term of three years' supervised release, a maximum

16   fine of $5 million, or twice what was gained from the offense,

17   or twice what was lost by someone other than yourself because

18   of the offense, and a $100 special assessment.  Do you

19   understand those maximum penalties?

20              THE DEFENDANT:  Yes, your Honor.

21              THE COURT:  In addition, Count 3, charges you with

22   securities fraud in connection with New Focus Capital Partners.

23   That has the same maximum penalties as Count 2; do you

24   understand that?

25              THE DEFENDANT:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

55J4ANTP

1          THE COURT:  Count 4 charges you with tampering with

2     evidence, and it carries a maximum sentence of 20 years'

3     imprisonment, a maximum term of three years' supervised

4     release, and the same fine as Count 1.  Do you understand those

5     maximum penalties for Count 4?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  In addition, there would have to be

8     restitution on those counts, do you understand that?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  While I have no reason to believe this

11     would happen, if you were to add all the imprisonment terms

12     together, if they were to run consecutively, that would amount

13     to 65 years' imprisonment.  Do you understand that?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  Do you understand that if as part of your

16     sentence you were to be placed on a term of supervised release

17     and were to violate any of the conditions of that release, your

18     supervised release term could be revoked and you could face an

19     additional term of imprisonment?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Do you understand that you have the right

22     to plead not guilty to these charges and the right to a trial

23     and jury trial if you wish?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  Do you understand that if you plead not

55J4ANTP

1    guilty and go to trial, you would be presumed innocent and the

2    burden would be on the government to prove your guilt beyond a

3    reasonable doubt?

4            THE DEFENDANT:  Yes, your Honor.

5            THE COURT:  Do you understand that at trial you would

6    be entitled to be represented by an attorney at all stages of

7    the proceedings and if you could not afford to hire one, an

8    attorney would be provided to you free of charge?

9            THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  Do you understand that at a trial you

11   would be entitled through your attorney to cross-examine any

12   witnesses called by the government?

13           THE DEFENDANT:  Yes, your Honor.

14           THE COURT:  Do you understand that at a trial that you

15   would be entitled to testify on your own behalf, that you could

16   call witnesses, and that you could use the subpoena power of

17   the court to compel them to attend.

18           THE DEFENDANT:  Yes, your Honor.

19           THE COURT:  Do you understand that at a trial you

20   would not be required to incriminate yourself, that is, you

21   would not be required to testify against yourself?

22           THE DEFENDANT:  Yes, your Honor.

23           THE COURT:  Do you understand if you enter a guilty

24   plea, you will be giving up these rights, you will not be able

25   to withdraw this plea, and the only remaining step will be

55J4ANTP

1    imposition of sentence?

2             THE DEFENDANT:  Yes, your Honor.

3             THE COURT:  Do you understand the nature of the

4    charges to which you are pleading?

5             THE DEFENDANT:  Yes, your Honor.

6             THE COURT:  Knowing all this, do you still wish to

7    plead guilty?

8             THE DEFENDANT:  Yes, your Honor.

9             THE COURT:  Have any force or threats been used either

10   direct or indirect to influence how you plead?

11            THE DEFENDANT:  No, your Honor.

12            THE COURT:  I have a copy, I have the original of a

13   letter dated May 2 from the United States Attorney's Office to

14   your attorney that contains the plea agreement.  Are you

15   familiar with this letter?

16            THE DEFENDANT:  Yes, I am, your Honor.

17            THE COURT:  Apart from what's contained in the letter

18   have any promises been made to you about the sentence you will

19   receive?

20            THE DEFENDANT:  No, your Honor.

21            THE COURT:  Do you understand that the decision as to

22   the appropriate sentence will be entirely up to the sentencing

23   judge?

24            THE DEFENDANT:  I do, your Honor.

25            THE COURT:  Do you understand in exercising her

55J4ANTP

1   discretion, she will be limited only by what the law requires?

2           THE DEFENDANT:  Yes, your Honor.

3           THE COURT:  Do you understand that even if you were

4   surprised or disappointed by your sentence, you will

5   nonetheless be bound by your guilty plea?

6           THE DEFENDANT:  Yes, your Honor.

7           THE COURT:  Did you sign this agreement?

8           THE DEFENDANT:  Yes, I did.

9           THE COURT:  Before you signed it did you discuss it

10  with your attorney?

11          THE DEFENDANT:  Yes, I did.

12          THE COURT:  Did he explain all it terms and

13  conditions?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  In reviewing the agreement I notice it

16  contains an analysis of how the government and your attorney

17  believe the law of sentencing, which we refer to as sentencing

18  guidelines, will impact on any prison term and states a

19  conclusion that the range of sentence would be 108 to 135

20  months' imprisonment.  Do you understand that?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Do you understand the sentencing judge is

23  not bound by the analysis and is free to do her own analysis

24  which could result in a different range?

25          THE DEFENDANT:  Yes, I do, your Honor.

55J4ANTP

1        THE COURT:  Do you understand that no matter what

2  range the sentencing judge comes to, there are certain

3  circumstances under which she could depart by going below or

4  above that range?

5        THE DEFENDANT:  Yes, your Honor.

6        THE COURT:  Do you understand that under the terms of

7  this agreement if you are sentenced to a prison term that is no

8  greater than 135 months, you are giving up your right to

9  complain about the sentence either through application to the

10  trial court or appeal; do you understand that?

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  Is your plea voluntary, that is, made of

13  your own free will?

14        THE DEFENDANT:  Yes, your Honor.

15        THE COURT:  Did you in fact commit the offenses that

16  are charged in Counts 1, 2, 3, 4 of the information?

17        THE DEFENDANT:  Yes, your Honor.

18        THE COURT:  Before I ask you to tell me what you did,

19  I am going to ask the government to summarize the elements of

20  the offenses and if they wish to tell me what evidence they

21  would offer in support.

22        MR. STELLMACH:  Yes, your Honor.  With respect to

23  Count 1 charging conspiracy, the government would have to show

24  four elements: first, that the defendant and at least one other

25  person entered into the unlawful agreement charged in the

55J4ANTP

1   information; second, that the defendant willfully and knowingly

2   became a member of the conspiracy; third, that at least one of

3   the overt acts charged in the information was committed

4   knowingly by a member of the conspiracy; and fourth, finally,

5   that the overt acts which were committed were in furtherance of

6   the conspiracy.

7           Counts 2 and 3 charge securities fraud.  On those

8   counts the government would have to prove three elements:

9   first, that in connection with the purchase or sale of

10  securities, the defendant did one or more of the following,

11  employed a scheme or artifice or device to defraud, obtained

12  money or property by means of untrue material statements or by

13  making statements which in light of all the circumstances were

14  misleading, by omitting to state material facts, or engaged in

15  acts, practices or a course of dealing that operated or would

16  operate as a fraud upon a purchaser; second, that the defendant

17  acted willfully, knowingly and with intent to defraud; and

18  third, that the defendant used or caused to be used means or

19  instruments of transportation, or communication, in interstate

20  commerce or use of the mails, in furtherance of the scheme.

21          Count 4 charges tampering with evidence.  With respect

22  to that count, the government would need to prove, first, that

23  the defendant corruptly altered, destroyed, mutilated or

24  concealed a record, document or other object; second, that the

25  defendant acted willfully, knowingly and with intent to impair

55J4ANTP

1    that object's integrity or availability for use in an official

2    proceeding.

3              With respect to what the evidence would show, your

4    Honor, the government through documents and testimony of

5    witnesses, including other members of the conspiracy who are

6    cooperating with the government, that the defendant was

7    president of a brokerage firm based in Upstate New York New

8    Rochelle called Platinum which also maintained branches at

9    various times in Florida and here in New York City.  The

10   government would also show that through his position at

11   Platinum, the defendant organized and participated in a

12   conspiracy to defraud investigators through two fraudulent

13   schemes.

14             The first scheme involved the private placement of

15   securities issued by Platinum Investment Holding Corporation,

16   among other things.  In connection with that scheme, the

17   defendant caused brokers at Platinum to make false statements

18   to their customers, persuading them to buy stock in PIHC.  The

19   second fraudulent scheme involved a hedge fund that Platinum

20   traded called New Focus.  In connection with that scheme the

21   defendant allowed and caused brokers to inflate the performance

22   of the hedge fund and to allow brokers to cancel personal

23   trading losses in their own accounts and rebill them to the

24   hedge fund trading account.

25             Finally, with respect to the tampering with evidence

55J4ANTP

1    charge, the government would show that in 2002, the SEC,

2    Securities and Exchange Commission, began an investigation into

3    Platinum, they issued document requests to Mr. Antonucci, among

4    other employees at Platinum, that Mr. Antonucci directed

5    employees to destroy documents which they didn't wish the SEC

6    to see, and the brokers proceeded to do that.  With respect to

7    venue on these counts, the government would show PIHC stock was

8    sold by brokers based here in New York City.  With respect to

9    New Focus, that the cancelling and rebilling we described was

10    effected through a clearing firm based here in New York City

11    and finally, the document requests which were issued by the SEC

12    were issued from their office here in Manhattan.

13          THE COURT:  Can you tell me in your words what you did

14    that forms the basis of your plea.

15          THE DEFENDANT:  Yes, your Honor.  I entered into an

16    agreement with others to violate the law.  Two schemes were

17    involved.  The first related to Platinum Investment Holding

18    Corporation.  I caused brokers to make misrepresentations to

19    investors.  The second related to New Focus Capital Partners

20    hedge fund.  I caused brokers to issue inflated performance

21    returns and falsify account statements.  I was aware that the

22    brokers were transferring personal losses to customers.  After

23    I learned of the SEC investigation, I directed brokers to get

24    rid of evidence I did not went them to see.

25          THE COURT:  Did you know what you were doing was

16

55J4ANTP

1    wrong?

2            THE DEFENDANT:  Yes, your Honor.

3            THE COURT:  Did you have as part of this scheme an

4    office in Manhattan?

5            THE DEFENDANT:  Yes, your Honor.

6            THE COURT:  This occurred approximately when?

7            THE DEFENDANT:  2002.

8            THE COURT:  Anything further.

9            MR. STELLMACH:  No, your Honor.

10            THE COURT:  Defense.

11            MR. SCHOEPPL:  Nothing further.

12            THE COURT:  Based on my colloquy with the defendant, I

13    find that he understands the nature of the charges and the

14    consequences of his plea.  I am also satisfied that his plea is

15    voluntary and there is a factual basis for it.  Accordingly, I

16    recommend that the proffered plea to Counts 1, 2, 3, 4 in the

17    information be accepted.

18            Anything further from the government.

19            MR. STELLMACH:  No, your Honor.

20            THE COURT:  The defense.

21            MR. SCHOEPPL:  Nothing further from the defense.

22            THE COURT:  Thank you.

23                         -  -  -

24

25

EXHBIT C

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA,**

**Case No. 04 Cr. 828 (SAS)**

-against-

**DOMINIC ANTONUCCI,**

**Defendant.**

_____/

## MEMORANDUM IN AID OF SENTENCING
## SUBMITTED ON BEHALF OF DOMINIC ANTONUCCI

The goal of a criminal sentence is that it be "reasonable." *United States v. Castillo*, 460 F.3d 337, 354 (2nd Cir. 2006) (appellate court reviews sentence imposed by district court for "reasonableness"). "Reasonableness" is defined "not only by the length of the sentence but also by the process the district court used to determine the sentence; in other words, a sentence must be substantively reasonable as well as procedurally reasonable." *Id.* In the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), district court sentencing "centers around 18 U.S.C. § 3553(a) which calls on the district court to 'impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection' and to 'consider' the . . . factors . . ." set out in § 3553(a). *Castillo*, 460 F.3d at 354. Those factors are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;
(2)     the need for the sentence imposed –
 (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B)     to afford adequate deterrence to criminal conduct;
 (C)     to protect the public from further crimes of the defendant; and
 (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)     the kinds of sentences available;
(4)     the kinds of sentences and the sentencing range established . . .;
(5)     any pertinent policy statement . . .;

United States v. Antonucci,
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

(6)    the need to avoid unwarranted sentence disparities among defendants with similar
       records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In *Castillo*, the Court of Appeals for the Second Circuit joined a number of other circuits in

concluding that while a district court may not impose a non-Guidelines sentence based on any

general policy disagreements with the Guidelines, "a sentence below the Guidelines range may be

reasonable, so long as it reflects the individualized, case-specific factors in § 3553(a)." *United States*

*v. Castillo*, 460 F.3d 337, 361 (2nd Cir. 2006), *quoting United States v. Williams*, 456 F.3d 1353,

1369 (11th Cir. 2006).[1]  Thus, crucial to any sentencing decision is an analysis of the factors set out

in § 3553(a) and each of these factors will  be discussed *seriatim* below.

**1.    *The Nature and Circumstances of the Offense and the History and Characteristics***
**    *of the Defendant***

**A.    Factual Background and Plea Agreement**

An Indictment was filed by the Government on August 10, 2004 naming Dominic Antonucci,

as well as six other defendants, with criminal wrongdoing in connection with fraud in the sale of

---

[1]

Both *Castillo* and *Williams* dealt with the widespread discontent regarding the disparity in
the Guidelines 100:1 ratio between crack and powder cocaine and concluded that district courts are
not free to reject the Guidelines purely on generalized policy grounds.  More significantly for
purposes of the present Sentencing Memorandum, however, the *Castillo* court emphasized that a
sentence below the Guideline range may be considered "reasonable" if based on the district court's
application of case-specific factors relevant to the § 3553(a) factors.  460 F.3d at 361.

*United States v. Antonucci*,
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

securities issued by PIHC and New Focus[2] and with tampering with evidence.  Indictment, DE 1.

Ultimately, on May 19, 2005, before Magistrate Judge Gabriel W. Gorenstein, Mr. Antonucci

entered a plea of guilty to a four-count Superseding Information.  *See* Superseding Information, DE

67.  In essence, the Information charged that Mr. Antonucci and others had solicited purchases of

PIHC units by falsely representing that proceeds from sales would be used to, among other things,

finance PIHC's efforts to acquire control of Platinum and that brokers and dealers would be paid

commissions of at most ten percent when they actually received 20 to 40 percent.  *Id.* at ¶¶ 1-29.  The

Information also contends that Mr. Antonucci and others conspired to cause two fraudulent private

placement memoranda to be distributed by mail throughout the United States.  *Id.*  The Information

also charged Mr. Antonucci and others with misappropriating substantially all of the proceeds from

the sale of the PIHC units.  *Id.*  The Information also states that Mr. Antonucci and others engaged

in fraud in connection with the sale of interests in New Focus, a supposed hedge fund managed by

Platinum, by representing to investors that their funds would be invested according to the dictates

of "IntelliTrend XL," a proprietary trading system ostensibly developed by Platinum.  *Id.* at ¶¶ 14-29.

Finally, the Information charges Mr. Antonucci and several of his co-defendants with tampering with

evidence with the intent to obstruct the SEC's investigation and to impair the integrity and

availability of evidence related to the investigation.  *Id.* at ¶¶ 50-58.

---

[2] "PIHC" refers to Platinum Investment Holding Corporation, while "Platinum" refers to Platinum Investment Corporation.  "New Focus" refers to New Focus Capital Partners.

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

Mr. Antonucci's plea agreement required that he plead guilty to the four offenses set forth

in the Information: (1) conspiracy to commit securities, mail, and wire fraud; (2) securities fraud in

connection with the sale of securities of PIHC; (3) securities fraud in connection with the sale of

securities of New Focus; and (4) tampering with evidence. *Id.*

Mr. Antonucci has accepted responsibility for his role in the criminal activity charged in the

Information and is remorseful that his actions in connection with PIHC and New Focus may have

caused pecuniary harm to certain persons.[3] However, that was never Mr. Antonucci's intention and

this is not a case where Mr. Antonucci was lining his pockets with money at the expense of

investors. To the contrary, Mr. Antonucci conducted the PIHC offering and the sale of New Focus

securities with the original intention of creating investment vehicles that could bear a possible

successful return to investors. Indeed, Mr. Antonucci hired attorneys (not the undersigned counsel)

to represent PIHC and Platinum in connection with providing, among other things, legal advice on

how to properly conduct and structure the offering of PIHC securities and in preparing the offering

documents transmitted to investors and prospective investors. Mr. Antonucci relied upon the legal

---

[3]

In reviewing the victim impact statements, Mr. Antonucci noted that Michael Dill ("Dill")
submitted a victim impact statement to this Court claiming that he lost $292,000.00. *See* the Dill
Letter attached hereto and incorporated herein by reference as **Exhibit W**. However, Dill was not
an investor in PIHC or New Focus and he did not lose $292,000.00. *See* the Handwritten Dill Letter
attached hereto and incorporated herein by reference as **Exhibit X** wherein Dill concedes that he lost
$150,000.00 ("I should have left $150,000 somewhere." *See* **Exhibit X**, at 1; and "You owe me
$150,000 . . ." *See* **Exhibit X**, at 3.). Thus, this Court should be wary of relying upon victim impact
statements that have no relation to PIHC or New Focus and/or be aware that investors may have
overstated their losses.

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

advice from these attorneys in structuring the offering of PIHC securities to the public, including, but not limited to, the disclosure of the commissions paid to brokers for offering and selling PIHC securities and the use of proceeds derived from the offering. While the offering memorandum for PIHC does, in fact, disclose that commissions of only ten percent (10%) were being paid to selling agents, Mr. Antonucci relied upon the advice of counsel in paying brokers an additional thirty percent (30%) for operating expenses. Mr. Antonucci acknowledges that he lumped the payments together in transfers of funds he made to the brokers, but the understanding was that thirty percent (30%) was to be used for establishing, *inter alia*, offices for the brokers in Florida and elsewhere and paying for operating expenses of those offices. At the time that the payments were made, Mr. Antonucci reasonably believed that he could legally do so based upon the advice of his former legal counsel. Although Mr. Antonucci now realizes that he violated the letter of the law in making these payments to brokers, that was not his intention at the time. The payments to the brokers also demonstrate that as much as forty percent (40%) went to the brokers, not to Mr. Antonucci. In addition, at the time that the SEC shut Platinum down, PIHC had entered into a definitive agreement to purchase a public company, paid $78,500.00 of the $85,000.00 purchase price, and was scheduled to close the transaction upon the receipt of audited financial statements from the public company.[4]

---

[4]        Mr. Antonucci believes that the $78,500.00 deposit was never recovered by the SEC and thus should be credited against the loss and restitution amount. Platinum, the SEC registered broker-dealer and NASD member firm, was going to merge into the public company following the closing of the acquisition transaction. However, the SEC injunction effectively blocked the transaction from taking place. Accordingly, the investors in PIHC never received the economic benefits associated

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

was in the process of acquiring a public shell company it entered to purchase agreements and made substantial monetary deposits upon and was going merge Platinum, the SEC registered broker-dealer and NASD member, upon the acquisition of the foregoing public shell company. These efforts were thwarted by the intervention of the SEC and due, in part to the failure of the SEC to appoint a Receiver to conserve the assets of Platinum, PIHC, and New Focus, much of the economic value that would have inured to the benefit of the investors was lost. We hope and trust that the Court will takes these factors into consideration when viewing the nature and circumstances of the offense.

### B.    A Portrait of Dominic Antonucci

As indicated in the PSI, Mr. Antonucci "was raised in a close-knit, intact family under moderate economic circumstances" and has described his childhood in glowing terms. PSI, at 16. He is the eldest of four children and has three brothers, Theodore, Lee, and Andrew. While two of his brothers, Ted and Lee, have experienced substance abuse problems, Mr. Antonucci recounts his early family life in favorable terms and credits his parents for infusing all of the boys with a solid work ethic and a strong moral compass. Consequently, Mr. Antonucci is deeply ashamed of the conduct that has brought him before this Court and blames no one but himself for his present circumstances. Further, his youngest brother, Andrew, was a co-defendant in this matter and Mr. Antonucci feels largely responsible for his brother's involvement and carries the guilt of knowing that he has brought his brother grave harm and his family great sorrow and distress.

---

with this transcation.

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

Mr. Antonucci has a high school diploma and completed several years at Rochester Institute of Technology taking courses in mechanical engineering. PSI at 17. For most of his professional life, he ran a general contracting business — earning roughly $50,000 a year — until his employees joined a union, his expenses increased and creditors obtained judgments forcing the business to close in 1999. *Id.* at 18-19. At that time, even though he had largely a working class background, Mr. Antonucci attempted to create a career for himself in the securities industry. Mr. Antonucci is very bright and learns easily and, after his construction business failed, he obtained seven NASD broker licenses and also obtained multiple licenses from New York State to sell life and health insurance. *Id.* at 17.    As a broker, however, Mr. Antonucci did not earn substantial income, making only about $10,000 a year. *Id.* at 18. Eventually, he fell into debt which continued to mount — and today is estimated at nearly a million dollars. *See, e.g.*, PSI at 20 (stating that Mr. Antonucci's liabilities are $930,369). In fact, the home that he resides in with his wife is currently in foreclosure.

Despite his aberrant criminal conduct as admitted in these proceedings, Mr. Antonucci has maintained an excellent relationship with his wife, parents, family, and friends, presumably because they know that, at heart, Dominic Antonucci is a kind and honorable man. Indeed, shortly after his arrest, his friends stepped forward to sign as a surety for his secured release and his friends continue to stand by him today. One of those friends is attorney James D. Doyle, Esq., who has known Mr. Antonucci on a professional level for nearly fifteen years:

> I am one of the individuals who volunteered to sign as surety for Dominic's secured release August 2004 pending disposition of this indictment. In doing so, I

7

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

·obviously assumed a major financial responsibility. I did so confident in Dominic's personal integrity and responsibility consistent with the strength of character he has consistently displayed throughout all the years I have known him.

Letter from James D. Doyle, Esq., included as **Exhibit G** attached hereto.

It is an indication of Mr. Antonucci's standing with his friends and family that so many of them have submitted impassioned letters on his behalf. While certain of those letters will be quoted from herein, they should be read in their entirety to gain the full scope of the devotion and love felt for Mr. Antonucci. *See* exhibits attached hereto. Numerous friends and family have submitted letters of reference and recommendation for Mr. Antonucci, as set out in the matrix below:

| Name | Exhibit |
|---|---|
| Mark D. Agostinelli | A |
| Kimberly Antonucci | B |
| Margaret and Ted Antonucci | C |
| Theodore Antonucci, Jr. | D |
| Diane and Alan Carapella | E |
| Margaret Mary Cacia | F |
| James D. Doyle | G |
| Pamela Fenlon | H |
| Roxanne Liberti | I |
| Russ Liberti | J |
| Betty and Bruce MacNaughton | K |
| Cody MacNaughton | L |

8

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

| Paul B. McGowan | M |
| David Ophardt | N |
| Kelly Ophardt | O |
| Philip Schwartz | P |
| Alice Sidoti | Q |
| Lee Sidoti | R |
| Russell Sinacori | S |
| Scott and Tammy Werner | T |
| Barry Wilt | U |
| Charles J. Zicari | V |

In reviewing the submissions of his friends and family, the word "generous" is often used to describe Mr. Antonucci, with nearly all of his friends commenting that he is generous with his time and has always been there for them if needed:

> Over the years we have spent countless hours together. I have had the chance to see Dominic with family and friends. He is always the first to offer a helping hand. He is someone I can always count on.
>
> . . .
>
> I am asking for compassion and mercy when imposing sentencing for Dominic. He is someone who is truly relied upon by all who know him. He has been an enormous help to our family several times, be it financial or emotional. He has always been there. He is now and will continue to be a part of our family's life. . . .

Letter of Scott and Tammy Werner, included as **Exhibit T** attached hereto. Indeed, a recurring theme in the descriptions of Mr. Antonucci are references to his caring nature and big heart, a man

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

who will not turn away any person or animal in need. *See, e.g.,* Letter from Margaret and Ted Antonucci Sr., included as **Exhibit C** attached hereto ("Caring is an integral characteristic in the persona of our son Dominic. Caring for his family, his friends and even for animals is second nature to him.").

Mr. Antonucci is fortunate to be blessed with a strong marriage to a woman he adores, his wife Kimberly. They have been married since 1985 and knew each other for ten years prior to their marriage. His wife describes her husband and their relationship:

> He is my world. He is a caring, kind and genuine man. He is always the first to offer his help to anyone. . . .
> Our relationship is rock solid. We do everything together and are especially close to both of our families. We love to participate in activities which benefit our physical health and well being. . . . We are also happy to spend time at home simply reading, caring for our pets, or doing yard work.

Letter from Kimberly S. Antonucci, included as **Exhibit B** attached hereto.

While he and his wife, Kim, do not have children of their own, Mr. Antonucci has been a tremendous influence on his nieces and nephews, particularly his nephew Cody and his cousin Barry. His nephew Cody, just 15 years old, has never met his father and considers Mr. Antonucci his best friend and father figure. *See* **Exhibit L** hereto. Mr. Antonucci has been there since Cody was born as a surrogate father figure and offers him guidance and support and talks to him about serious issues like drugs. *Id.* Mr. Antonucci impresses upon Cody the importance of education and urges him to stay in school, get good grades and go to college one day. *Id.* At one point, Cody became interested

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

in wrestling and Mr. Antonucci taught him the ropes and attends nearly all of Cody's wrestling competitions.[5] *Id.*

His cousin Barry's biological father was a career criminal and a drug addict and was largely absent from the home so Barry was left without much of the support and guidance that a young boy desires from his father. In large part, Mr. Antonucci filled the void in Barry's life, provided the love and support needed by the young man, and today takes great pride in Barry's accomplishments. Barry credits the successful life he has now, at age 26, to the attention, care and guidance lavished by Mr. Antonucci:

> Dominic is dedicated to his family and friends like no one else I've ever seen. I believe he is a person who comes along once in someone's life if you're lucky. Your honor, in that regard, I am very lucky! Not so in the normal understanding of a nuclear family. I NEVER had a father and never will.....he passed last year from complications of a compromised life lived. My mother, although very loving, is a recovering drug addict. Obviously I did not have the luxury of a good upbringing by my parents. I can state with all honesty that my cousin Dominic was the involved and driving force which kept me from the cesspool of evil I was surrounded with. . . . Today, thanks to the only true father I know...Dominic....I am the owner of a successful business. Truly, I owe the direction my life has taken, the success and the future dreams in my life to Dominic. He has given me every reason to admire him and I will continue to for the rest of my life.

Letter from Barry L. Wilt, Jr., included as **Exhibit U** attached hereto.

He is extremely involved with his family and utterly devoted to his wife, Kimberly. After

---

[5]Mr. Antonucci is also interested in the martial arts and uses that interest to work with youth as an instructor of the martial arts since he believes that it is a productive way for young men to develop their mental, physical and spiritual strength.

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

his wife and his family, Mr. Antonucci is probably most caring of his dogs. He and Kim have three dogs, saved from shelters, and dote on them. Recently, Mr. Antonucci saved a pregnant dog from going to a shelter, delivered the puppies, hand fed them, and found them good homes.

While true that Mr. Antonucci made some poor decisions that resulted in the criminal conduct to which he has plead guilty, it is hoped that the foregoing description of Mr. Antonucci — and the eloquent and moving letters of his family and friends — will offer the Court a more complete picture of the man. Rather than judge him solely on the basis of the worst part of an otherwise good and productive life, it is hoped that the Court will have some idea of the content of Mr. Antonucci's heart and the enormous love and compassion that lies within him.

Dominic Antonucci is beloved by his family and friends and, notwithstanding the charges to which he has plead guilty, respected for his work ethic, integrity and warm heart. Mr. Antonucci, at age 39 (Mr. Antonucci's date of birth is April 6, 1967), is a relatively young man with much of his life before him and he is a man upon whom many people depend. This is the only time in his life that he has engaged in criminal conduct and he is deeply ashamed of what he has done. Furthermore, he has left the securities industry entirely and is pursuing a career in property management and real estate.

2.    *The Need for the Sentence Imposed –*

   (A)    *to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

   (B)    *to afford adequate deterrence to criminal conduct;*

   (C)    *to protect the public from further crimes of the defendant; and*

*United States v. Antonucci*,
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

    **(D)**    *to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner*

The Guideline range, discussed in more detail below, reflects the perceived seriousness of the offenses and provides, as a matter of general policy, the correlation between the Guideline sentencing range and the foregoing factor. Having learned a very hard lesson, Mr. Antonucci, with no prior criminal history, is in no danger of committing any further crimes against the public and, pursuing a new career in real estate, his incarceration will not " provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."

    *3.*    **The Kinds of Sentences Available**

*See* discussion of factor number 4, immediately following.

    *4.*    **The Kinds of Sentences and the Sentencing Range Established . . .**

In the Plea Agreement, Mr. Antonucci and the Government stipulated to the following: (a) the base offense level under the Sentencing Guidelines is 6; (b) because the loss amount exceeded $1,000,000, but did not exceed $2,500,000, the base offense level is increased by 16 levels; (c) because the offense involved more than fifty victims, the base offense level is further increased by 4 levels; (d) because the offense involved an abuse of trust, the base offense level is further increased by 2 levels; (e) because the offense involved obstruction of justice, the base offense level is further

13

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

increased by two levels; and (f) because Mr. Antonucci acted as the organizer of criminal conduct involving five or more participants, the base offense level is increased further by 4 levels. The Government agreed not to oppose a downward adjustment of 3 levels for acceptance of responsibility pursuant to § 3E1.1(b) of the 2001 Sentencing Guidelines. Consequently, Mr. Antonucci's stipulated offense level is 31. Mr. Antonucci has no criminal history points and falls within Criminal History Category I. Mr. Antonucci's stipulated Guidelines range, pursuant to the 2001 Sentencing Guidelines, is therefore from 108 to 135 months.

In the Plea Agreement, Mr. Antonucci and the Government agreed that neither a downward nor an upward departure from the stipulated Guidelines range of 108 to 135 months is warranted. Accordingly, neither party will seek such a departure or seek any adjustment not set forth in the Plea Agreement. The parties also agreed that neither will suggest that the Probation Department consider such a departure or adjustment, or suggest that the Court *sua sponte* consider such a departure or adjustment. The parties did, however, agree that either could seek a sentence outside of the stipulated Guidelines range, suggest that the Probation Department consider a sentence outside of the stipulated Guidelines range, and suggest that the Court *sua sponte* consider a sentence outside of the stipulated Guidelines range, based upon the factors to be considered in imposing a sentence under 18 U.S.C. § 3553(a):[6]

---

[6] While the Guidelines range provides a framework within which the Court imposes a sentence, that framework is only advisory. *United States v. Booker*, 543 U.S. 220, 249-60 (2005) (holding that defendant's Sixth Amendment rights were violated when he was sentenced according

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

The Probation Department conducted a presentence examination and calculated Mr. Antonucci's total offense level to be 31, as agreed in the Plea Agreement. *See* Presentence Investigation Report (the "PSI") at 5 and 14-15. The Probation Department also found that Mr. Antonucci has no prior criminal history. *Id.* at 15-16.

Since he entered his plea last year, Mr. Antonucci has not only fully accepted responsibility for his actions but he has made substantial efforts to cooperate with law enforcement by granting interviews to the Federal Bureau of Investigation in both New York and Florida for a criminal investigation conducted by the United States Attorney's Office for the Southern District of Florida. Specifically, Mr. Antonucci has, among other things, met with the Federal Bureau of Investigation in Florida and New York for extensive debriefing sessions. Prior to and subsequent to each debriefing session, Mr. Antonucci voluntarily provided the Government with documents germane to the issues raised in the debriefing sessions. In total, Mr. Antonucci provided hundreds of documents to the Government in connection with his cooperation. In addition, Mr. Antonucci, through his undersigned counsel, provided written analysis to the Federal Bureau of Investigation of certain evidence that Mr. Antonucci felt was essential to the Government's investigation. The criminal investigation is ongoing in nature and Mr. Antonucci has been informed that the Federal

---

to factual findings made by judge rather than jury). Rather than strike the Sentencing Guidelines in their entirety, the Court excised the language making the Guidelines mandatory and indicated that sentencing judges are to consider the Guidelines along with other factors set out in 18 U.S.C. § 3553(a). *Id. See also United States v. Lake,* 419 F.3d 111, 114 (2d Cir. 2005) (without mandatory duty to apply Guidelines after *Booker,* consideration of other 3553(a) factors "acquires renewed significance") (quotation marks omitted and citation omitted).

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

Bureau of Investigation may request further assistance from Mr. Antonucci in the future. While the government is not in a position at this time to offer a "substantial assistance" departure from the Sentencing Guidelines in return for Mr. Antonucci's cooperation, Mr. Antonucci's efforts to cooperate and his attempt to demonstrate remorse for his actions through that cooperation should not be entirely ignored. On behalf of Mr. Antonucci, a three level downward adjustment is requested.[7] If such a downward adjustment is made, Mr. Antonucci's sentencing level would be 28 and the 2001 Guideline range would be 78-97 months.[8]

**5.    *Any Pertinent Policy Statement . . .***

Even though PSI did not reflect that Mr. Antonucci had alcohol abuse problems, he has – since the PSI was completed – developed a problem with alcohol abuse stemming from his financial problems and anxiety associated with the sentence to be imposed by this Court in the instant case.

---

[7] A Section 5K1.1 recommendation "usually falls within the range of 2 to 5 levels." *United States v. Belvett*, 2005 WL 852649 at *2 (M.D. Fla. 2005). Thus, the requested reduction of three levels – which is in the middle of this range – would encourage cooperation even when the government is not prepared to make a formal motion for downward departure and is well within the court's discretion.

[8] Section 1B1.4 of the Sentencing Guidelines, entitled "Information to Be Used in Imposing Sentence (Selecting a Point Within the Guideline Range or Departing from the Guidelines), provides that "[i]n determining the sentence to impose within the guideline range, or whether a departure from the Guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless prohibited by law." The commentary explains that "[a] court is not precluded from considering information that the Guidelines do not take into account in determining a sentence . . ."

16

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

Mr. Antonucci respectfully requests that this Court recommend that he participate in the Bureau of

Prisons' (BOP) 500-hour, comprehensive, residential drug abuse program (RDAP).

**6.    *The Need to Avoid Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct***

Since Mr. Antonucci will be the last of the defendants in this case to be sentenced, the

following matrix represents the sentences imposed on the other defendants:

| Defendant | Imprisonment Sentence Imposed[9] | Date of Sentencing |
|---|---|---|
| Marcos Martinez | 37 months | September 13, 2005 |
| Andrew Antonucci | 57 months | September 27, 2005 |
| Eugene Cabrera | 30 months | November 15, 2005 |
| Sean Beard | A year and a day | December 23, 2005 |
| Richard Dearcop | 15 months | January 6, 2006 |
| Stephen Blood | 6 months | February 15, 2006 |

Of the above defendants, all except for Andrew Antonucci were brokers who received

excessive commissions. The most "similar" defendant, in terms of background and underlying

criminal conduct, is Andrew Antonucci, Mr. Antonucci's brother, who was sentenced at a level 25

---

[9]

This figure reflects only the sentence of imprisonment as reflected on the PACER docket sheet. For example, the PACER docket sheet reflects that Mr. Martinez was sentenced to 37 months imprisonment, 36 months supervised release, $100 special assessment and restitution. DE102, DE127. Only the imprisonment sentence is reflected in the matrix.

17

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

Guideline sentence even though the Government had sought a level 27 Guideline sentence of 70-87 months. A "similar" two-level reduction in the sentence for Mr. Dominic Antonucci would result in a level 29 Guideline sentence, and, after the Court credits Mr. Antonucci's efforts to cooperate with the Government as requested above, a level 26 Guideline sentence of 63-78 months.

### 7.    *The Need to Provide Restitution to Any Victims of the Offense*

It is anticipated that the Court will order Mr. Antonucci to pay significant restitution in the amount of $2,838,385.14. As noted above, Mr. Antonucci lacks sufficient financial resources to pay restitution at this time and the foregoing figure is not accurate after giving effect to credits and other adjustments for funds and other assets recovered and/or that should have been recovered as a result of the asset freeze and reductions in overstated victim losses (i.e., Dill).

### CONCLUSION

As indicated previously, the Guideline calculation set forth in the Plea Agreement and the PSI mandates a sentence between 108 and 135 months and a fine between $15,000 and $5 million. Given the foregoing analysis of the factors set forth in 18 U.S.C. § § 3553(a), a sentence is requested at or below the level that his brother, Andrew Antonucci received, and given Mr. Antonucci's inability to pay any fine and likely continued inability to pay any fine, no fine should be imposed. Mr. Antonucci also respectfully requests that this Court recommend to the BOP that Mr. Antonucci participate in RDAP.

18

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

As a final request, Mr. Antonucci requests a recommendation that he be permitted to serve his sentence at the Federal Correctional Institution at McKean, Pennsylvania because Andrew Antonucci, the Defendant's brother, is presently housed there and that he also be permitted sixty (60) days from the date of sentencing to attempt to finish his cooperative efforts with the Federal Bureau of Investigation before being required to surrender to the institution designated by the Bureau of Prisons.

Dated: November 3, 2006
*Boca Raton, Florida*

Respectfully submitted,

**s/ Carl F. Schoeppl, Esq. (CS7917)**
**SCHOEPPL & BURKE, P.A.**
*Counsel for the Defendant, Dominic Antonucci*
4651 North Federal Highway
Boca Raton, Florida 33431-5133
Telephone: (561) 394-8301
Facsimile: (561) 394-3121
E-Mail: carl@schoepplburke.com

19

*United States v. Antonucci,*
Case No. 04 Cr. 828 (SAS)
Memorandum in Aid of Sentencing
Submitted on Behalf of Dominic Antonucci

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on November 3, 2006, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to

the following: William Stellmach, Esq., Assistant United States Attorney.   I further certify that a

true and correct copy of the foregoing was served in the manner provided upon the person listed

below on this 3rd   day of November, 2006.

s/ **Carl F. Schoeppl, Esq.**
One of the Attorneys for
Defendant, Dominic Antonucci

| Party | Method of Service | Name, Address, Telephone, and Facsimile of Party's Counsel |
|---|---|---|
| *United States of America, Plaintiff* | U.S. Mail | David Siegel, Esq. Assistant United States Attorney United States Attorney's Office One St. Andrew's Plaza, Room 529 New York, New York 10007 Telephone: (212) 637-2281 Facsimile: (212) 637-2454 |

F:\Antonucci - DOJ\Pleadings\FinalSentencingMemorandumDominicAntonucci.11.03.06.wpd

EXHBIT D

715dants
SENTENCE

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                    New York, N.Y.

4                    v.                          04 Cr. 828 (SAS)

5   DOMINIC ANTONUCCI,

6                    Defendant.

7   ------------------------------x

8
                                                January 5, 2007
9                                               3:19 p.m.

10
    Before:
11
                      HON. SHIRA A. SCHEINDLIN,
12
                                                District Judge
13

14                            APPEARANCES

15  MICHAEL J. GARCIA
         United States Attorney for the
16       Southern District of New York
    BY:  WILLIAM STELLMACH
17       Assistant United States Attorney

18  SCHOEPPL & BURKE, P.A.
         Attorneys for Defendant
19  BY:  CARL F. SCHOEPPL

20

21

22

23

24

25

715dants
SENTENCE

1         THE COURT:  Please be seated.

2         Good afternoon, Mr. Stellmach.

3         MR. STELLMACH:  Good afternoon, your Honor.

4         THE COURT:  Good afternoon, Mr. Schoeppl.

5         MR. SCHOEPPL:  Schoeppl.  Good afternoon, your Honor.

6         THE COURT:  Right.  And good afternoon, Mr. Antonucci.

7         THE DEFENDANT:  Good afternoon, your Honor.

8         THE COURT:  And to those members of your family who

9   are here.

10         I have reviewed the revised presentence report dated

11   August 29, 2005, together with the sentencing recommendation

12   and the addendum of the same date.  I have also reviewed a book

13   of victim impact statements prepared by the victim witness

14   coordinators.

15         In addition, I reviewed a sentencing memorandum from

16   defense counsel dated November 3, 2006, together with many

17   exhibits, including letters from the defendant, his family and

18   many friends.  I have also reviewed a response from the

19   government dated November 13, 2006.

20         Mr. Schoeppl, have you reviewed all of the materials I

21   have just listed?

22         MR. SCHOEPPL:  Yes, I have, your Honor.

23         THE COURT:  And do you have any objections to anything

24   in the presentence report other than the issues you addressed

25   in your letter?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

715dants
SENTENCE

1    MR. SCHOEPPL:  No, we do not.

2    THE COURT:  Have you gone over all the material that I

3  have just listed with your client?

4    MR. SCHOEPPL:  Yes, ma'am, I have gone over all of the

5  items with Mr. Antonucci.

6    THE COURT:  Mr. Stellmach, have you reviewed all of

7  the material I have just listed?

8    MR. STELLMACH:  Yes, your Honor, and we have nothing

9  to add.

10    THE COURT:  All right.  Are there any fact issues in

11  dispute here that would require a *Fatico* hearing?

12    MR. STELLMACH:  Not from the government's perspective,

13  your Honor.

14    MR. SCHOEPPL:  Not on behalf of the Defendant

15  Antonucci, your Honor.

16    THE COURT:  All right.  I therefore adopt the findings

17  of fact set forth in the presentence report.

18    The defendant has pled guilty, pursuant to a plea

19  agreement, to four counts -- two counts of securities fraud;

20  one count of conspiracy to commit mail fraud, wire fraud and

21  securities fraud; and one count of tampering with evidence.

22  All counts may be grouped pursuant to Section 3D1.2(c) of the

23  guidelines.

24    The base offense level for these frauds is 6, pursuant

25  to Section 2B1.1(a)(2).  In his plea agreement and in his

715dants

SENTENCE

1    guilty plea allocution, defendant specifically agreed that the

2    amount of loss was greater than $1 million but less than

3    two-and-a-half million dollars.  As a result, the base offense

4    level must be increased by 16 levels, to Level 22, based on

5    this level of intended loss, pursuant to Section

6    2B1.1(b)(1)(I).  Moreover, because defendant has agreed that

7    the offense involved more than 50 victims, the base offense

8    level is increased by an additional four levels, to Level 26,

9    pursuant to Section 2B1.1(b)(2)(B).

10    Because the offense involved the abuse of a position

11    of trust, an additional two levels are added, to Level 28,

12    pursuant to Section 3B1.3.

13    Because the offense involved obstruction of justice,

14    an additional two levels, to Level 30, are required pursuant to

15    Section 3C1.1.

16    Finally, because Mr. Antonucci was the organizer of

17    criminal activity involving five or more participants, the base

18    offense level is further increased by four levels, to Level 34.

19    The offense level is then decreased by three levels,

20    to Level 31, based on defendant's acceptance of responsibility

21    pursuant to Section 3E1.1(a) and (b).

22    The defendant has no prior convictions.  As a result,

23    he falls in Criminal History Category I.

24    His guideline range at Offense Level 31, Criminal

25    History Category I, is 108 to 135 months in custody and a fine

715dants
                        SENTENCE
1    range of $12,500 to $5 million.

2              Finally, restitution here is required.

3              With that, Mr. Schoeppl, do you wish to be heard?

4              MR. SCHOEPPL:  Yes, your Honor, I do.

5              Your Honor, may I approach?

6              THE COURT:  Yes.

7              MR. SCHOEPPL:  It is a little easier for me.

8              THE COURT:  Sure.  Whatever is good for you.

9              MR. SCHOEPPL:  Thank you.

10             Good afternoon, your Honor.  My name is Carl Schoeppl.

11   I am counsel for the defendant, Dominic Antonucci, in this

12   case.

13             Your Honor, we're going to request a nonguidelines

14   sentence pursuant to Section 3553(a).  We believe that there

15   are statutorily mandated grounds that qualify Mr. Antonucci for

16   such a sentence.

17             To give you a little bit of background about

18   Mr. Antonucci, he is a 39-year-old male, your Honor.  He comes

19   from a close-knit family.  A lot of friends and family members

20   have submitted letters which were attached to our memorandum,

21   but I believe that two in particular warrant some highlighting

22   for you.

23             One of the areas that we believe that Mr. Antonucci

24   qualifies for is extraordinary charitable acts.  We believe,

25   your Honor, that Mr. Antonucci has done things in his life that

715dants

SENTENCE

1   most people don't do.

2           Mr. Antonucci, he's got some family members, two

3   family members particularly that I want to focus on.  One is

4   Cody MacNaughton.  Cody MacNaughton wrote a letter which is

5   attached to Exhibit L to our sentencing memorandum, your Honor.

6   He is a 15-year-old nephew of Dominic Antonucci.  Mr. Antonucci

7   has essentially been a surrogate father of Cody.

8           Mr. Antonucci has been there since I believe the day

9   Cody was born, and he's tried to provide Mr. MacNaughton with a

10  role model, leadership, mentorship.  And Mr. MacNaughton

11  expresses in his letter that Dominic Antonucci not only is a

12  father figure to him but also his best friend.  And the kind of

13  efforts that Mr. Antonucci has displayed, going way beyond the

14  extra mile in charitable efforts, for giving all of himself to

15  his nephew, Cody, for the last 15 years.  He has done that from

16  the day he was born all the way up to now, your Honor, and that

17  is one example that we think he gives a specific fact that

18  would give rise to an extraordinary charitable act on the part

19  of Mr. Antonucci.

20          We also have a cousin that Mr. Antonucci has, Barry

21  Wilt.  That's spelled W-I-L-T.  He is 26 years old now.  But

22  Mr. Wilt, like Mr. MacNaughton, also hasn't had a father in his

23  life.  Mr. Dominic Antonucci has served as a father figure for

24  Mr. Barry Wilt as well, and he's done that for the better part

25  of Mr. Wilt's life.  And he's done that throughout his life.

715dants

SENTENCE

1    And Mr. Wilt also wrote a letter, which is attached as

2    Exhibit U to our sentencing memorandum, which details the kind

3    of efforts that Mr. Dominic Antonucci has done to really act as

4    a father.  Even though he doesn't have children of his own,

5    your Honor, he's done it benevolently in this fashion.

6    And as you read each of the letters, I think one of

7    the measures of a man is not when he falls short, when he in

8    this case has committed an offense that is a serious crime, but

9    look at the measure of a man over his life, and Mr. Antonucci

10   does not have a criminal background.  He has never made a

11   transgression like this before.

12   He has a brother, Andrew Antonucci, your Honor, who is

13   a younger brother to Mr. Dominic Antonucci, who is currently

14   incarcerated as a codefendant in this case; your Honor

15   sentenced him last year.  And it is very difficult, obviously,

16   when you have that kind of a situation going on, but Dominic

17   did plead guilty in this case.  He did accept his

18   responsibility, your Honor.

19   And we believe a second factor that warrants a

20   nonguidelines' sentence under Section 3553(a) are extraordinary

21   post-offense rehabilitative acts.  We believe that

22   Mr. Antonucci has gone beyond the extra mile in this regard.

23   Mr. Antonucci did plead.  He offered cooperation to the

24   government in this case in this action.  However, this

25   proceeding did not result in the government in the Southern

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

715dants
                              SENTENCE

1    District of New York utilizing him for assistance and, hence,

2    we don't have a 5K motion from the government in this case.

3            However, in a separate case that was being

4    investigated in the United States District for the Southern

5    District of Florida, Mr. Antonucci, without the benefit of

6    having any type of cooperation agreement, voluntarily gave his

7    time and money and effort and lifetime and effort with trying

8    to help.

9            In that case, your Honor, this is a case involving

10   some very difficult areas that the government in the Southern

11   District of Florida did not have linkages to certain evidence.

12   One of the things that Mr. Antonucci did in that case -- he was

13   debriefed in Florida on two different occasions extensively by

14   an FBI agent as well as in New York he also was debriefed -- he

15   has provided hundreds of documents to the government in that

16   case.  He also has commissioned me to help the A.U.S.A.s that

17   have been involved in the case with analyzing a lot of the key

18   evidence in that case.  And as a result of some areas that the

19   government lacked, Mr. Antonucci was able to provide missing

20   links in some of those areas.

21           Now, one of the things that is unfortunate, and the

22   Court I'm sure is well aware, that we don't have a 5K1 motion

23   from the Southern District of Florida pending before you at

24   this time.  I've conferred with the Assistant United States

25   Attorney who is currently assigned to the case.  The

715dants

SENTENCE

1   investigation is still pending, your Honor, and they simply are

2   not in a position to be able to commit to giving a 5K1 before

3   sentencing.  They have not ruled it out; they say that it is

4   still a possibility.  But, obviously, if he is sentenced, it is

5   going to have to take the form as a Rule 35 motion hereafter.

6          One of the things I want to explain to the Court is

7   the fact that in that case we were very hopeful that we would

8   get a 5K1 motion from the government, but there has been

9   multiple prosecutors assigned to the case.  And the first

10  prosecutor who was assigned to the case -- he was extremely

11  motivated to prosecute and push the case -- he was reassigned

12  to the Terrorism Unit in Washington, so he was completely

13  relocated and the case fell to another Assistant United States

14  Attorney.  That successor Assistant United States Attorney also

15  apparently was reassigned, and then a third Assistant United

16  States Attorney now is handling the case; he just received the

17  case at the end of last year.

18         That Assistant United States Attorney has not been up

19  to speed on the case fully and, frankly, isn't in a position to

20  be able to really vigorously push the case as the first

21  A.U.S.A. who was on the case.

22         And Mr. Antonucci, I think unfortunately, has fell

23  victim to just, through no fault of his own, through the normal

24  goings on at the U.S. Attorney's Office that happened.  But

25  that is still out there, your Honor, and that could occur, but

715dants
SENTENCE

1    we can't count on that today.

2        But I believe that one of the things that

3    Mr. Antonucci has for him today under 3553 is the fact that he

4    didn't have to do any of this.  He doesn't have an agreement

5    and he did it.  And I think it shows that he does have a sense

6    of post-offense rehabilitation.

7        He's been gainfully employed since he has pled guilty

8    in this case, your Honor, in the real estate business.

9        He has been married for eleven years.  His wife is

10   here today in the courtroom, Kimberly.  His mother and father

11   are both here today, Mr. Ted Antonucci and Mrs. Margaret

12   Antonucci.

13        It is unfortunate, your Honor.  There are four boys in

14   this family.  Three of the boys have unfortunately been

15   involved in some criminal matters.  Andrew is in prison right

16   now.  There is another brother that Mr. Dominic Antonucci has

17   that is also currently in prison on drug-related offenses

18   unrelated to this.  But that has been something that

19   Mr. Antonucci has been very careful to try to help in his

20   family.  And one of the factors that the Court has to look to

21   in this case is that it has to impose a sentence that is

22   sufficient but not greater than necessary to comply with the

23   purposes that are set forth in 3553, and in this case we

24   believe that there are some unique factors that I think would

25   warrant the Court looking at the overall sentences that the

715dants

SENTENCE.

1  Court has done in this case.

2       Mr. Andrew Antonucci was the president of Platinum

3  Investment Holding Corporation.  That was one of the entities,

4  your Honor, that conducted the alleged offering of securities,

5  or two different offerings that were conducted by that company.

6       Andrew Antonucci was the president of that company;

7  Mr. Dominic Antonucci was not.  Mr. Dominic Antonucci was the

8  president of a broker-dealer, Platinum Investment Corporation,

9  and that corporation was owned -- the majority of the shares

10 were owned by Mr. Antonucci's brothers, not by Mr. Dominic

11 Antonucci.  And one of the factors that we've got here, your

12 Honor, is Mr. Andrew Antonucci received a sentence after your

13 Honor reduced his levels two levels, pursuant to the

14 nonguidelines' sentence factors for extraordinary charitable

15 act and extraordinary post-offense rehabilitation, from a 29

16 level -- I'm so sorry, 27 level to a 25 level, your Honor, and

17 Mr. Andrew Antonucci received a sentence of 57 months, and that

18 is the harshest sentence that has been imposed in this case to

19 date.

20      There have been an additional five codefendants in

21 this case that have been sentenced -- the shortest sentence was

22 six months for Mr. Stephen Blood -- obviously ranging on up all

23 the way to Mr. Andrew Antonucci of 57 months.  The guideline

24 range, which is the stipulated guideline range in the plea

25 agreement, mandates a sentence, your Honor, that is nearly

715dants

                              SENTENCE

1     twice what Mr. Andrew Antonucci --

2              THE COURT:  Yes, I have said it is 108 to 135 months.

3              MR. SCHOEPPL:  Right.  And to satisfy the purposes of

4     3553, we don't believe that a guidelines' sentence is necessary

5     in order to satisfy the deterrent purposes that are required

6     under the statute; we don't believe that is necessary to

7     reflect the seriousness of the offense or to provide just

8     punishment or to protect the public from further violation from

9     somebody like Mr. Antonucci.  We believe that a lesser,

10    nonguideline sentence can provide all of those factors that

11    would be below the guideline range in this case, and we believe

12    that the Court should take into consideration some of those

13    specific factors.

14             Now, this case did not go to trial so there hasn't

15    been an adjudication of the specific facts that went on in this

16    case, and in our sentencing memorandum we attempted to just

17    provide a little bit of insight as to certain factors that

18    arose with respect to this event.  I want to highlight those

19    for the Court.

20             The first is that Mr. Dominic Antonucci was not a

21    person that was receiving the kickbacks in this case of the

22    commissions that were being paid.  One of the central

23    allegations in the Indictment, now Superseding Information,

24    your Honor, is the fact that there was a private placement

25    memoranda -- actually, two different memoranda -- that had

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

715dants
                              SENTENCE

1   there were traders that worked for Mr. Antonucci, Mr. Blood and

2   Mr. Beard, and what they did, they incurred losses and the

3   losses they incurred in new accounts were being covered up.

4   They prepared phony account statements to cover up the losses

5   and show profits and those were sent out.

6            Now, Mr. Antonucci did not know about that beforehand,

7   he learned about it after the fact, and the problem with this

8   is that Mr. Antonucci acquiesced and he didn't stop it.  And it

9   happened.  And both Mr. Blood and Mr. Beard, both of whom have

10  been sentenced in this case, Mr. Blood received a six-month

11  sentence and Mr. Beard received a sentence of a year and a day.

12           Now, in this case, your Honor, we want to make sure

13  that the Court is aware that we acknowledge that there were a

14  number of victims in this case.  Now, we have reviewed the

15  victim impact statement in this case and I'm sure the Court

16  has, as well, and one of the points that we've observed is that

17  many of the victims, while they are definitely complaining

18  about the loss of money that they made in these investments, I

19  believe the majority of them, at least half of them, do not ask

20  for punishment, they ask for the money back.

21           And one of the things that I think is important here

22  in this case just to consider, we acknowledge there was an

23  impact, we acknowledge restitution of a serious magnitude needs

24  to be imposed against Mr. Antonucci, but we also believe that

25  at 39 years old, we would like to see Mr. Antonucci return back

715dants

SENTENCE

1    to the community as a productive member, who can produce

2    income, who, hopefully, can help to try to pay this off some

3    day.   Obviously, the longer that he is in, the longer he is not

4    able to do that.   We would request that the Court take that

5    into consideration in devising the appropriate fair and just

6    sentence for Mr. Antonucci.

7            Now, there are some specific requests that we have

8    made, your Honor, in our sentencing memorandum, but I wanted to

9    highlight a couple of things that are not in dispute that the

10   government will agree to do as part of our recommendations,

11   your Honor.   One is we recommended that the Court recommend to

12   the Bureau of Prisons that Mr. Antonucci participate in the

13   RDAP program.   The government has no objection to that

14   recommendation.

15           We have also requested that Mr. Antonucci be permitted

16   to surrender 60 days from today, your Honor, in order to wind

17   down his affairs, but also I have placed telephone calls to the

18   FBI agent and the prosecutor in the Southern District of

19   Florida to advise them that Mr. Antonucci was going to be

20   sentenced today and that if they needed to interview him,

21   debrief him, use him for a witness, that it would be easier to

22   do that obviously now than when he is incarcerated, and the

23   government has no objection to that, your Honor.

24           The third request that we have made is that he be

25   permitted to serve at the Federal Correctional Facility McKean.

715dants
                            SENTENCE

1   That's where his brother, Anthony Antonucci, is currently

2   serving his sentence, a prison camp.  They also have the RDAP

3   program there as well.

4           And we've also asked Mr. Antonucci -- I would like him

5   to make a statement --

6           THE COURT:  Of course.

7           MR. SCHOEPPL:  -- that I would like him to show --

8           THE COURT:  That is always -- that is the next thing I

9   say when you are done talking.

10          MR. SCHOEPPL:  So I would like now at this point,

11  Mr. Antonucci, if you can please stand --

12          THE COURT:  Mr. Schoeppl, I must say, that's my job.

13          Thank you, Mr. Schoeppl, for your remarks.

14          Mr. Antonucci, would you like to be heard?

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  Thank you.  Wherever you are comfortable.

17          THE DEFENDANT:  Your Honor, I stand before you to be

18  fairly and justly sentenced.  I know my crimes were serious and

19  warrant punishment, serious punishment.  I accept full

20  responsibility for my involvement in committing these crimes.

21  I am deeply ashamed of my conduct; it does not represent me as

22  a person.

23          In my life I've made extraordinary charitable

24  contributions.  As my attorney stated, I am a surrogate father

25  to my nephew Cody and a father to my nephew -- my cousin,

715dants
SENTENCE

1  Barry, for all their lives, and I believe my support of Barry

2  and Cody has resulted in them being productive and well

3  adjusted young man.

4         I have also shown extraordinary post-offense

5  rehabilitation following my arrest.  I am a productive member

6  of society, gainfully employed.  My close-knit family depend on

7  me for so many things.  I've also done my best to go the extra

8  mile in showing my rehabilitation by cooperating, not only

9  cooperating in this case but to cooperate in a separate

10 distinct criminal investigation.  I have met with the FBI and

11 other law enforcement personnel on several occasions in New

12 York and in Florida.  They've requested that I search for

13 documents and information, which I did and provided, and I've

14 called an attorney to further assist the FBI, and I provided

15 key evidence and linkage that the FBI was missing.

16        My cooperation has not resulted in a downward

17 departure, but I believe this shows extraordinary evidence for

18 my nonguidelines' sentence, your Honor.

19        Furthermore, I believe that if I'm sentenced within --

20 to the range -- sorry, your Honor.  If I'm sentenced within the

21 guideline range, a significant disparity will result.  My

22 brother Andrew was president of one of the entities; I was

23 president of the other entity.  And while I acknowledge my

24 offenses, I don't believe a guidelines' sentence of nearly

25 twice my brother is just or appropriate.  So I respectfully

715dants
SENTENCE

1    request that your Honor be merciful on me and give me a

2    sentence of equal to or less than my brother, your Honor.

3         And I want your Honor to know from my heart, I've done

4    good things all my life that could fill this room, that I've

5    done a teacup of maybe bad things.

6         And in this deal, I want your Honor to know that I

7    never tried to line my own pocket, and I understand my conduct

8    was wrong.  I very much want your Honor to understand that.

9         Thank you, your Honor.

10        THE COURT:  Thank you, Mr. Antonucci.

11        Mr. Stellmach.

12        MR. STELLMACH:  I will be very brief, your Honor.

13        As the government outlines in its sentencing

14   submission, we believe that the factors in 3553(a) actually

15   support a guidelines sentence in this case.  The nature and

16   circumstances of the offense reveal that this was a very

17   carefully orchestrated, thought out scheme.  It was in fact a

18   series of schemes organized by Mr. Antonucci.

19        THE COURT:  This Mr. Antonucci?

20        MR. STELLMACH:  This Mr. Antonucci.  He was the leader

21   and organizer.  That is what differentiates him from his

22   brother Andrew.

23        THE COURT:  Right.  There is a four-level difference

24   because of that.

25        MR. STELLMACH:  Precisely.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

715dants
SENTENCE

1    And this wasn't aberrational conduct.  This wasn't a

2    momentary lapse in judgment.  It transpired over the course of

3    a year.  And it wasn't just one fraud; it was the private

4    placement fraud, then the hedge fund fraud, and then, I think

5    even more disturbing for somebody who works in the criminal

6    justice system, there was then the destruction of documents

7    that were subpoenaed by the SEC.  Once the regulators were

8    circling, it was Mr. Antonucci, this Mr. Antonucci, who

9    directed the destruction of evidence, and evidence was in fact

10   destroyed.  That was a crime, your Honor, that goes to the

11   heart of the system.  It goes beyond the integrity of Platinum,

12   beyond even the losses experienced by the investors.

13   And with respect to those investors, I'm not going to

14   try to recharacterize or resummarize all the victim testimony

15   or all the victim submissions, but they paint a very vivid

16   picture of just what a stark and devastating event their

17   involvement in Platinum, their investment in Platinum entrusted

18   in Mr. Antonucci brought to their lives.

19   Mr. Antonucci, I appreciate, didn't live on the

20   Riviera, he didn't have an extravagant lifestyle, but he did

21   personally profit.  And this wasn't a crime driven by desperate

22   need or some sense of compulsion, this was a crime driven by

23   greed.

24   And I respect Mr. Schoeppl.  I've worked with him.  I

25   found him very forthright and candid and I appreciate what he

715dants

SENTENCE

1    said, but I have to say, your Honor, that there is nothing in

2    the defendant's background that in the government's view

3    warrants a guidelines' departure.  If anything, the letters

4    that have been submitted, the statements by various family

5    members, by numerous friends, show that this was a very closely

6    connected, loving, supportive family.  It was an intact family.

7    And despite all of that, he went out and committed these

8    crimes.  It makes what we're dealing with here today all the

9    more inexplicable and I think in some sense inexcusable because

10   of that.

11         And one point that Mr. Schoeppl did make that I do

12   differ very strongly on is the suggestion that Mr. Antonucci --

13   the victims would benefit in some way if Mr. Antonucci were at

14   liberty in order to repay them.  Under that rationale, very few

15   fraud defendants would ever serve any time in prison.

16         Finally, with respect to Mr. Antonucci's attempted

17   cooperation, I can say that I met with Mr. Antonucci for about

18   two hours one afternoon and I found him very candid and very

19   forthright.  The reason that that interview didn't result in a

20   5K letter is because it came too late in the process.

21   Mr. Antonucci came forward after the house of cards had

22   essentially collapsed, it was too late.

23         Florida is working with him in some capacity, I

24   understand.  But to give him credit at this stage for what he

25   is attempting to do down there, it strikes me as very

715dants
SENTENCE

1    speculative, at best.  I don't doubt that they are working very

2    hard and diligently; I have confirmed that with the prosecutors

3    down in Florida.  He's been debriefed.

4         THE COURT:  I understand your point.  You are saying

5    that when and if a Rule 35 is made, that is the time to talk

6    about it.

7         MR. STELLMACH:  Exactly.

8         THE COURT:  I understand.

9         I have a few questions for you.

10        You do agree to the things that Mr. Schoeppl said you

11   agreed to, the recommendation of RDAP program and the

12   self-surrender in 60 days; you agree with both of those?

13        MR. STELLMACH:  I do, your Honor.

14        Thank you.

15        THE COURT:  I have one last question.  Restitution,

16   were you thinking of submitting a separate order following

17   these proceedings, and all I need to do at these proceedings is

18   to say that restitution is ordered but the amount will be

19   determined in a timely manner after these proceedings?

20        MR. STELLMACH:  Exactly, your Honor.

21        THE COURT:  Any objection to that, Mr. Schoeppl?

22        MR. SCHOEPPL:  No objection, your Honor.

23        THE COURT:  All right.

24        I turn now to the consideration of the statutory

25   factors which the Court must consider in order to determine a

715dants
SENTENCE

1    reasonable sentence.

2         The first, of course, is the nature and circumstances

3    of the offense and history and characteristics of the

4    defendant.

5         This defendant participated in a sophisticated fraud

6    for about 13 months, from mid-2001 through August 2002.  This

7    Mr. Antonucci appears to be the driving force behind these

8    frauds.  There were many victims of this fraud collectively

9    losing millions of dollars.  Having read the letters of the

10   victims, I know that this defendant's conduct shattered the

11   lives of some of his victims and hopes and dreams of others.

12        Then I turn to the defendant's history and

13   characteristics.  This 38-year-old defendant is married but has

14   no children.  His wife is the owner of Empire Business, a

15   property management company located in Rochester, New York.  He

16   has a good relationship with his wife.  He had never had a drug

17   or alcohol problem, although he states that he recently

18   developed an alcohol abuse problem, probably because of the

19   stress relating to this case, and now he seeks assignment to

20   the residential drug abuse program while in custody.

21        He graduated from high school and attended college but

22   did not graduate, and passed several examinations relating to

23   the securities business.  He has worked almost continually in

24   financial services from 1999 to 2003.  After his arrest, he

25   worked for his wife as a property manager at Empire Business.

715dants

                              SENTENCE

1   Before he became involved in the financial services he worked

2   in the construction industry.

3          His wife owns the home he lives in and he seems to

4   have no other significant assets.  On the other hand, he has

5   accumulated close to $900,000 in debt, much of it made up of a

6   large tax assessment.

7          I have read each of the 22 letters submitted by

8   defense counsel and attached to his submissions.  In his letter

9   he quoted portions of some letters but asked that the Court

10  read each letter, and I did and always do exactly that.

11         These letters present a picture of a very different

12  person than the one who organized and led this fraud that

13  caused so many victims so much suffering.  The picture

14  presented in these letters is of a very caring, very thoughtful

15  family member who cared for nephews and cousins who needed him

16  and for neighbors and coworkers who needed him.  He has also

17  been an exemplary son, grandson, and husband.  While I accept

18  these letters at face value and believe what these people say

19  about the defendant, they, of course, cannot excuse his

20  criminal conduct.

21         To the contrary, a person with his advantages, who has

22  a loving family, an education, and innate talent, as well as

23  the ability to be a leader in the community, really has no

24  excuse to do what he did except that he placed the needs of

25  himself and his family way ahead of the needs and rights of his

715dants
                          SENTENCE

1    victims.   In other words, he had financial pressures, developed

2    a scheme to try to get out of debt, and had to accept that many

3    strangers would be injured in the process.   Knowingly lying to

4    strangers in an effort to get their money for one's own use is

5    a terrible thing and does not deserve a reward.

6          The next is the need for the sentence imposed.

7          A significant sentence of incarceration is required to

8    deter this defendant and others like him from committing crimes

9    of financial fraud.   That's necessary to reflect the

10   seriousness of this type of crime, promote respect for the law,

11   and provide just punishment, to afford deterrence both for this

12   defendant and to others who would undertake similar conduct,

13   and to protect the public from further crimes of the defendant.

14         The last factor to cover is irrelevant here, which is

15   providing needed educational and vocational training.

16         Then the next factor under the statute is the kinds of

17   sentences available.   That's really for the cases where there

18   is a choice between jail and non-jail.   Here there is no

19   choice.   The only question before the Court is how long the

20   jail term should be.

21         The next factor is the guidelines' sentence and the

22   applicable policy statements.   I have already calculated the

23   guidelines.   You all heard it.   It is 108 to 135 months.   It is

24   based on the type of scheme, the amount of losses, the number

25   of victims, the abuse of a position of trust that these

715dants

SENTENCE

1    investor victims placed in Mr. Antonucci, his leadership role,

2    and his obstruction of justice as a result of knowingly

3    destroying relevant evidence.

4        Defendant seeks a nonguidelines' sentence on several

5    grounds.  He argues that his attempted cooperation with the

6    government should be rewarded, but this argument is unavailing.

7    To date, his cooperation has not resulted in substantial

8    assistance.

9        Defense counsel's request for a three-level departure

10   as if he had provided substantial assistance is simply

11   mysterious.  If and when the government believes that the

12   cooperation has been useful, the Court will undoubtedly learn

13   of it through a motion to reduce sentence pursuant to Rule 35

14   of the Federal Rules of Criminal Procedure.

15       As noted in the government's letter, defendant also

16   states a nonguidelines' sentence based on the odd argument that

17   he is not at fault because he was relying on the advice of

18   counsel and because the SEC's intervention caused some of the

19   loss because the hoped for investment never materialized.

20   These arguments are simply unpersuasive, at best, and

21   disingenuous, at worst.  If a lawyer counseled him to commit a

22   crime, he should tell that to the FBI if it is not too late to

23   prosecute that lawyer.  As for the SEC, its intervention

24   probably stopped this group from stealing money from many more

25   victims.  These arguments made me wonder whether the defendant

715dants

SENTENCE

1    has really accepted responsibility at all and whether he should

2    receive a three-level reduction for acceptance of

3    responsibility.  I felt the same way this afternoon with the

4    "teacup" argument.

5        Then there is the need to avoid unwarranted sentencing

6    disparities.

7        This was the overwhelming purpose behind the Sentence

8    Reform Act of 1984 and it survives the *Booker* analysis.  The

9    guidelines system was promulgated to set forth a national norm

10    for certain criminal conduct.  The guidelines sentence is

11    generally reasonable, and the Court must give this factor

12    serious consideration.  Moreover, the remaining 3553(a) factors

13    must provide the Court with a good reason to deviate from this

14    benchmark, and I have discussed all of these factors already.

15        Then there is the need to provide restitution, and I

16    will, of course, order restitution now but the amount to be set

17    in a separate proceeding.  I do understand that imprisonment

18    will delay and impede the payment of such restitution.

19    Nonetheless, the victims here are ordinary people, not large

20    financial institutions.  Some lost as little as a thousand

21    dollars, others lost over $100,000, I think, although there are

22    only four in that range.  The sooner Mr. Antonucci is out of

23    prison, the greater the possibility that he could begin to pay

24    back some of the money.

25        So I realize the factor of restitution does favor the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

715dants

SENTENCE

1    imposition of a sentence either at the low end of the

2    guidelines or even nonguidelines.  But considering all of that

3    and considering the goals of sentencing and the individual I am

4    sentencing, it is my intention to impose a sentence of 108

5    months in custody to be followed by a three-year period of

6    supervised release.

7              In addition, the required special assessment of $400

8    must be paid immediately.

9              No fine is imposed because of the mandatory

10   restitution which, as I stated, will be determined at a

11   separate proceeding or by submission.  Actually, I think the

12   amount is going to be $2,283,385.14.  Really, what is going to

13   be determined was the schedule of payment in a written order

14   that will be proposed to the Court.

15             Defendant is to be supervised in the district of his

16   residence, and the standard conditions of probation as

17   recommended by the Probation Department shall apply.

18             In addition, the mandatory conditions, that the

19   difficulty shall not commit another federal, state or local

20   crime; defendant shall not illegally possess a controlled

21   substance; and defendant shall not possess a firearm or

22   destructive device are imposed.

23             The mandatory drug testing condition is suspended

24   based on this Court's determination that the defendant poses

25   little or no risk of future substance abuse

715dants

SENTENCE

1    The following special conditions shall also apply:

2    One, defendant shall provide the Probation Department

3    with access to any requested financial information; and, two,

4    defendant shall not incur new credit charges or open additional

5    lines of credit without the approval of the Probation

6    Department and only if he is in compliance with his restitution

7    obligations.

8    Finally, defendant is to report to the nearest

9    Probation Office within 72 hours of his release from custody.

10    Are there any legal objections before sentence is

11    imposed?

12    MR. STELLMACH:  Not from the government, your Honor.

13    MR. SCHOEPPL:  Your Honor, I think, pursuant to

14    3553(a), we have an objection concerning the -- we believe that

15    there are extraordinary charitable acts that need to be

16    considered.

17    THE COURT:  I have considered that.  I am glad you

18    raised it so the record is even more complete.

19    I said I read each of the 22 letters.  I obviously

20    also listened to your presentation here in court and to the

21    defendant's presentation.

22    While he certainly has done good acts, helping family

23    members is something that everyone should aspire to and they

24    are not extraordinary.  These were his relatives, his nephew

25    and his cousin.  He was very good to them.  He acted as a

715dants
SENTENCE

1   father to them.  I said earlier I accepted at face value those

2   letters, but I do not consider that extraordinary.

3       You might recall that I did depart, so to speak, on

4   that ground for the brother, but that was a most unique

5   situation.  Frankly, for a white male from upstate New York to

6   virtually adopt kind of a homeless black child I thought was

7   pretty extraordinary, pretty darn unusual, in my experience.

8   Maybe it isn't so extraordinary in your experience, but it was

9   pretty extraordinary in mine.  I thought it warranted a

10  departure.

11      Of course, I've already said the range wasn't the

12  same, anyway, because he was at a 27 and I departed by two

13  levels, and as we know here, the range starts here at 31.  In

14  any event, I did consider that as well as what you have

15  described as his extraordinary post-offense rehabilitation.

16  Again, I didn't find it extraordinary under the law.  He

17  maintained a job.  He stayed close with his family.  He

18  attempted to cooperate with the government.  Those are things

19  that many, many defendants do.  They are not what I think the

20  cases define as extraordinary.

21      In any event, if that is your objection, that is noted

22  for the record.

23      Pursuant to the Sentencing Reform Act of 1984, it is

24  the judgment of this Court that the defendant, Dominic

25  Antonucci, is sentenced to 108 months of custody to be followed

715dants

SENTENCE

1    by three years of supervised release.  The defendant shall be

2    supervised in the district of his residence and be required to

3    adhere to the standard, mandatory and special conditions set

4    forth earlier.

5         He is further required to pay the mandatory assessment

6    of $400, which payment is due immediately.

7         Finally, he is required to pay the restitution that I

8    mentioned earlier, except the amount and the details are to be

9    set in a separate order at a later date.

10        Now, with respect to these recommendations, I have to

11   say I would not have recommended the RDAP program.  I thought

12   it was, frankly, more gaming of the system, but since the

13   government consents to it, I won't stand in the way, and I will

14   make the recommendation that if the Bureau of Prisons considers

15   it appropriate, he be placed in an RDAP program at the

16   appropriate time.

17        As far as the surrender, you have troubled me because

18   there has been such a long time waiting for this sentence to

19   occur; but, once again, since the government has agreed to a

20   60-day surrender and since, apparently, you want to give that

21   notice to the U.S. Attorney's Office in Florida so that they

22   might be able to take advantage of that two-month period,

23   again, I will go along with it, albeit somewhat reluctantly.

24        On the other hand, with respect to recommending a

25   facility, that I am always pleased to do, although the Bureau

715dants

SENTENCE

1  of Prisons does not always listen to that recommendation, for a

2  good reason.  I'm not critical of them, but they have different

3  considerations in making placements.  So I will recommend that

4  he be placed at FCC McKean so that he could be near to his

5  brother, which I suppose will be good for both of them, and the

6  Bureau of Prisons can do what it will do.  If it can't do it,

7  it won't do it, but I will make that recommendation in the

8  written judgment and commitment form.

9          I impose this sentence as stated.

10         Mr. Antonucci, you have the right to appeal this

11 sentence within ten days but only to the very limited extent

12 permitted by your plea agreement.  If you cannot pay the cost

13 of appeal, you have the right to apply for leave to appeal in

14 forma pauperis.

15         Is there anything to dismiss here, Mr. Stellmach?

16         MR. STELLMACH:  The underlying indictment, your Honor.

17         THE COURT:  No objection to that, I assume?

18         MR. SCHOEPPL:  No objection, your Honor.

19         THE COURT:  The underlying indictment is dismissed.

20         Now, the surrender date, I guess I have said 60 days.

21 Today is January 5th.  So that sounds like Monday, March 5th.

22 I hope that the designation can be done by then.

23         Mr. Stellmach, you should urge the Bureau of Prisons

24 to get this one done.  Sometimes they don't, but this one has

25 been a long time.

715dants

SENTENCE

1    MR. STELLMACH:  Yes, your Honor.

2    THE COURT:  All right.  Anything further?

3    MR. STELLMACH:  Nothing your Honor.

4    THE COURT:  All right.  Thank you.

5    MR. SCHOEPPL:  Nothing further for the defendant.

6    Thank you, your Honor.

7

8                         -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXHBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

      - v. -

DOMINIC ANTONUCCI,

          Defendant.

- - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/30/07

**ORDER**

S1 04 Cr. 828 (SAS)

      Defendant DOMINIC ANTONUCCI having come before the
Court for sentencing, it is hereby

      ORDERED that pursuant to 18 U.S.C. §§ 3663A(a)(1),
3663A(c)(1)(A)(ii), 3664(f)(1)(A), and 3664(f)(2), the defendant
shall make restitution to each of the victims identified in
Exhibits A and B in the amount of their net loss described in
those exhibits.  It is further

      ORDERED that pursuant to 18 U.S.C. § 3663A(h)
restitution shall run jointly and severally between and among the
defendant and any of his co-conspirators to be sentenced to
restitution for the victims identified in Exhibits A or B.  It is
further

      ORDERED that all payments from the defendant's assets
shall be distributed pro rata, based on the proportion of each
victim's loss to the total losses incurred by victims identified
in Exhibits A and B.  However, it is further

ORDERED that the Court shall retain jurisdiction over this matter to issue such further orders as may be necessary to effect restitution to the victims of the offense in this case.

SO ORDERED.

HONORABLE SHIRA A. SCHEINDLIN
UNITED STATES DISTRICT COURT JUDGE
SOUTHERN DISTRICT OF NEW YORK

DATED:    New York, New York
          April 30, 2007

2

PIHC INVESTORS

| Name | Net *** Amount *** | Pro Rata Share of Loss | Street Address | City | ST | Zip |
|---|---|---|---|---|---|---|
| Adolfo Bueno | $90,000.00 | 4.40% | 1009 79th St. | North Bergen | NJ | 07047 |
| Alex Whiteside | $21,875.00 | 1.07% | Woodfold Farm, Off Presi Alston, Longridge | | UK | PR33BJ |
| Amit Patel | $2,500.00 | 0.12% | 1017 East Hills Rd. | West Covina | CA | 91791 |
| B & G Security (William Gill) | $5,000.00 | 0.24% | 3489 West 72nd Ave., No. Westminster | | CO | 80030 |
| Barry Jordan | $60,000.00 | 2.93% | 553 Glebe Rd. | Westmoreland | NH | 03467 |
| Bruce Clemment | $30,000.00 | 1.47% | 100 Anderson Ave | Anniston | AL | 36201 |
| Casa De Leon | $10,000.00 | 0.49% | 813 East 1st Ave. | El Paso | TX | 79901 |
| Cecil Rhoads | $10,000.00 | 0.49% | 7325b Chapel Villas IN | Indianapolis | IN | 46814 |
| Charlie Edmund | $30,000.00 | 1.47% | Plant Hatch US 1 North | Baxley | GA | 31513 |
| Clifton Langer | $10,000.00 | 0.49% | | Chicago | IL | |
| Daniel & Katherine Monti | $10,000.00 | 0.49% | 363 Walnut St. | Newtonville | MA | 02460 |
| Darren Kaiser | $1,500.00 | 0.07% | 507 Riverwood Dr. | Cedar Park | TX | 78612 |
| David & Janet Reilly | $10,000.00 | 0.49% | 341 Horseshoe Rd. | Morgantown | WV | 26508 |
| David Kilgore | $5,000.00 | 0.24% | 208 South 2nd Ave. | Rock Rapids | IA | 51246 |
| Denise Pennelly | $10,000.00 | 0.49% | 4551 Piper St. | Fremont | CA | 94538 |
| Derek Ferguson | $80,000.00 | 3.91% | 235 E 11th Street - Apt 5G | New York | NY | 10003 |
| Edward Ferree | $50,000.00 | 2.44% | PO Box 427 | Saxonburg | PA | 16356 |
| Edward Gosnell | $5,000.00 | 0.24% | 2899 Lawrence Dr. | Wantagh | NY | 11793 |
| Edwin Renderos | $10,000.00 | 0.49% | 915 79th Street | North Bergen | NJ | 07407 |
| Elizabeth Amaya | $10,000.00 | 0.49% | 200 Winston Dr. #2710 | Cliffside Park | NJ | 07010 |
| Ernie Velasquez | $7,500.00 | 0.37% | 3735 Clover Valley Rd. | Rocklin | CA | 95677 |
| Fort Smith Waste Paper Co. | $20,000.00 | 0.98% | 301 North Second St., Are | Fort Smith | AK | 72901 |

| Name | Amount | Percent | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| Frank Castaldi | $30,000.00 | 1.47% | Waltz Ct. | Prospect Heights | IL | 60070 |
| Frederic Borges | $5,000.00 | 0.24% | 7174 Everglades Ave. | San Diego | CA | 92119 |
| Frederick & Patricia Williams | $5,000.00 | 0.24% | 12125 Wood Glen Dr. | Fort Wayne | IN | 46814 |
| Gene King | $50,000.00 | 2.44% | 1223 Elmwood Ave. | Columbia | SC | 29201 |
| Georgio Castaldi | $10,000.00 | 0.49% | 803 Waltz Court | Prospect Heights | IL | 60510 |
| Glen Billeter | $22,500.00 | 1.10% | 7594 South Lincoln St | Midvale | UT | 84047 |
| H & M Landscaping & Trucking | $40,000.00 | 1.96% | 55 Spring Hill Ave. | Norwalk | CT | 06850 |
| Harold Hertzig | $25,000.00 | 1.22% | 1776 6th St., NW, Apt. 105 | Winter Haven | FL | 33681 |
| Henry Lindsley | $150,000.00 | 7.33% | PO Box 7567 | Dallas | TX | 75209 |
| Henry Munzeles | $10,000.00 | 0.49% | 1355 49th St. | Brooklyn | NY | 11219 |
| Howard Binder | $40,000.00 | 1.96% | 6155 WCR 23 | Fort Lupton | CO | 80621 |
| Jack Eaton | $20,000.00 | 0.98% | 1112 Greenbriar Rd. | Lafayette | LA | 70503 |
| James Leinweber | $69,500.00 | 3.40% | 8 Burton Lane | warwick | NY | 10990 |
| James Mathis | $10,000.00 | 0.49% | 39930 245th St. | Mount Vernon | SD | 57363 |
| James Nance | $10,000.00 | 0.49% | 501 Scenic Circle | East Aboca | AL | 36260 |
| James Wheatley | $10,000.00 | 0.49% | 66 Brookmore Rd. | West Hartford | CT | 06107 |
| Jason Mathis | $10,000.00 | 0.49% | 39930 245th St. | Mount Vernon | SD | 57363 |
| Jerry Harper | $20,000.00 | 0.98% | 1807 East Church St. Ext. | Martinsville | VA | 24112 |
| Jerry Redd | $50,000.00 | 2.44% | 3470 La Caminita | Lafayette | CA | 94549 |
| John Hopkins | $40,000.00 | 1.96% | 119 Rover Blvd. | Los Alamos | NM | 87544 |
| John Peay | $10,000.00 | 0.49% | 3465 Legacy Trace | Alpharetta | GA | 30022 |
| Joseph Rowey | $10,000.00 | 0.49% | 148 Social St. | Woonsocket | RI | 02895 |
| Kirk Reilly | $10,000.00 | 0.49% | 1882 South Elkhound Ave | Meridian | ID | 83642 |
| Leslie Reizes | $10,000.00 | 0.49% | 2917 S. Ocean Blvd | Boca Raton | FL | 33432 |
| Marion Grout & Susan Comeau | $10,000.00 | 0.49% | 135 Boston St. | Middleton | MA | 01949 |
| Mark Leeds | $35,000.00 | 1.71% | 633 South Federal Highw Ft. Lauderdale | | FL | 33302 |

| Name | Amount | Percent | Address | City | State | Zip |
|---|---|---|---|---|---|---|
| Mark Melich | $9,643.00 | 0.47% | 22 Ontario Blvd. | Hilton | NY | 14468 |
| Marx Pales | $30,000.00 | 1.47% | 871 Dug Hill Rd. | Brownsboro | AL | 35741 |
| Michael Dill | $280,000.00 | 13.69% | 32 Titus St. | Rochester | NY | 14617 |
| Michelle Carter | $10,000.00 | 0.49% | 3100 North Ocean Blvd., #Ft. Lauderdale | FL | 33308 |
| Michial & Rhonda Joines | $1,000.00 | 0.05% | 2805 North 1st St. | Durant | OK | 78701 |
| Rich Wolbert | $20,000.00 | 0.98% | | | MN | |
| Richard & Mary Madison | $10,000.00 | 0.49% | 3901 Chapparal Rd | Roswell | NM | 88201 |
| Richard Holgate | $10,000.00 | 0.49% | POB 166 | Owego | NY | 13827 |
| Richard Timm | $20,000.00 | 0.98% | 161 North Lansdowne Av Lansdowne | PA | 19050 |
| Robert Kathary | $20,000.00 | 0.98% | 2400 East Las Olas Blvd., #Ft. Lauderdale | FL | 33301 |
| Robert McKearney | $100,000.00 | 4.89% | 1880 Country Club Rd | Harrisonburg | VA | 22802 |
| Robert Moser | $10,000.00 | 0.49% | 4502 10th Ave. | Temple | PA | 19560 |
| Ronald Franklin | $20,000.00 | 0.98% | 5219 Hitching Post Rd. | Portage | MI | 49009 |
| Sheldon & Denise Smith | $10,000.00 | 0.49% | PO Box 773 | Coalville | UT | 84017 |
| Stephen Metcalfe | $20,000.00 | 0.98% | 2680 Dulcinea Dr. | Henderson | NV | 89014 |
| Thann Nguyen & Tiffany Tran | $5,000.00 | 0.24% | 1802 Antries Dr. | Salt Lake City | UT | 84116 |
| Thomas Blum | $10,000.00 | 0.49% | 1500 Compton Rd. | Cincinnati | OH | 45231 |
| Tina Williams | $10,000.00 | 0.49% | | | | |
| Ulf Erenius | $21,500.00 | 1.05% | 3695 Alisos Rd. | Arroyo Grande | CA | 93420 |
| US Copy & Design | $39,000.00 | 1.91% | 1541 Spring Garden St. | Philadelphia | PA | 19130 |
| Van Nguyen | $10,000.00 | 0.49% | 1802 Antries Dr. | Salt Lake City | UT | 84116 |
| Walton Harden | $20,000.00 | 0.98% | 2377 Rockaway Industrial Conyers | GA | 30012 |
| William Brown | $10,000.00 | 0.49% | PO Box 304 | Rosedale | MS | 38769 |
| William Miller | $10,000.00 | 0.49% | W9155 Peterson Dr. | Iron Mountain | MI | 49801 |
| William Ponsetti | $109,000.00 | 5.33% | 6 McIntonsh Ct. | Novato | CA | 94949 |
| William Stone | $30,000.00 | 1.47% | 24512 Arcadia Farm Rd. | Pass Christian | MS | 39571 |

$2,045,518.00    100.00%

*** Net Amount is less amounts paid back to investor.

4/23/2008

US Postal Inspection Service Confidential

# EXHBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -x

DOMINIC ANTONUCCI,                     :

             Petitioner.          :          AFFIDAVIT OF
                               CARL F. SCHOEPPL

      - v. -                           :

UNITED STATES OF AMERICA,       :          08 Cv. 0529 (SAS)

            Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF FLORIDA                          )
COUNTY OF PALM BEACH              : ss.:
SOUTHERN DISTRICT OF FLORIDA  )

        I, CARL F. SCHOEPPL, under penalties of perjury, affirm the following:

        1.    I am a citizen of the United States and a resident of the state of

Florida.

        2.    I have practiced law since 1989, specializing in complex commercial

litigation, securities litigation, and white collar criminal defense.  Prior to starting to my own

firm, I was employed with the United States Securities and Exchange Commission, Division

of Enforcement, where, in addition to litigating securities actions, I served as the Ethics

Counsel for the SEC's Southeast Regional Office.  I am admitted to practice in this District,

among numerous federal and state jurisdictions, and I have never been subject to any

disciplinary proceedings or prosecution for ethical violations in my nineteen years at the bar.

3.    I initially represented Dominic Antonucci in discussions with the United States Attorney's Office for the Southern District of New York related to its investigation into the operations of Platinum Investment Corporation, and, following indictment, I continued representing Mr. Antonucci through all stages of <u>United States v. Antonucci, et al.</u>, 04 Cr. 828 (SAS), including sentencing.

4.    At some point, Mr. Antonucci and I discussed the possibility of him pleading guilty, and I initiated discussions with Assistant United States Attorney William J. Stellmach regarding a disposition in the case.

5.    Mr. Stellmach and I discussed the applicable Sentencing Guidelines. At the outset, he explained that, because the charged conduct continued through August 2002, the 2001 edition of the Sentencing Guidelines would apply in this case and that the applicable guideline would be § 2B1.1.  Specifically, Mr. Stellmach advised me that the Guidelines calculation would yield a sentencing range of 108 to 135 months' imprisonment. In exchange for a guilty plea that stipulated that range as the applicable Guidelines range, the Government agreed to enter into a plea agreement that enabled

Mr. Antonucci, among other things, to raise any arguments at sentencing for a non-Guidelines sentence based on the factors set forth in 18 U.S.C. § 3553(a).  At no time in my discussions with Mr. Stellmach did he suggest that any guideline other § 2B1.1 of the 2001 edition of the Sentencing Guidelines applied to Mr. Antonucci.

2

6.      When I discussed the plea offer with Mr. Antonucci, I therefore explained the 2001 Sentencing Guidelines in some detail, and the Government's position that the applicable sentencing range was 108 to 135 months' imprisonment.  Because Mr. Antonucci's charged criminal conduct continued well into 2002, there simply was no basis to apply the earlier version of the Guidelines, and my discussions with Mr. Antonucci did not involve the 2000 Sentencing Guidelines.  Accordingly, at no time in my discussions with my client, or anyone else, did I ever suggest that any guideline other than § 2B1.1 in the 2001 edition of the Sentencing Guidelines applied to Mr. Antonucci.

7.      After my client indicated that he was prepared to plead guilty pursuant to an agreement containing the Guidelines range of 108 to 135 months, I requested a draft plea agreement from Mr. Stellmach.  Before my client signed that agreement, I showed it to him and reviewed it in detail, including the stipulation that the applicable sentencing range was 108 to 135 months.  We also discussed the enhancements set forth in the 2001 edition of the Sentencing Guidelines, which I showed to Mr. Antonucci.  I never stated or suggested in any way whatsoever that any sentencing range applied in Mr. Antonucci's case other than the stipulated 108 to 135 month range, or that there were any agreements with the Government other than those contained in the actual plea agreement.

3

8.    At various points subsequent to Mr. Antonucci executing the plea agreement, the sentencing range of 108 to 135 months and/or the 2001 Guidelines were referenced, including at: (1) the plea proceeding; (2) the Presentence Investigation Report prepared by the Probation Department; and (3) sentencing.

Date:   April 23rd, 2008

CARL F. SCHOEPPL, ESQ.

4

# EXHBIT G

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DOMINIC ANTONUCCI,                    :

           Petitioner.          :          **AFFIDAVIT OF**
                                     **CHARLES A. ROSS**

          - v. -          :

                                  **08 Cv. 0529 (SAS)**

UNITED STATES OF AMERICA,          :

           Respondent.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

STATE OF NEW YORK          )
COUNTY OF NEW YORK      : ss.:
SOUTHERN DISTRICT OF NEW YORK  )

      I, CHARLES A. ROSS, under penalties of perjury, affirm the following: 1.

         I am a citizen of the United States and a resident of the state of

Florida.

      2.     I have practiced law since 1982, specializing in complex

commercial litigation and white collar criminal defense. Prior to starting to my own firm,

I was employed as a trial attorney in the Criminal Defense Division of Legal Aid in the

South Bronx, an Assistant Federal Defender for the Southern District of New York, a

partner in Brafman & Ross, and chair of the White Collar Criminal Defense Group at

Herrick, Feinstein. I am admitted to practice in this District, among numerous federal and

state jurisdictions.

      3.     I represented Andrew Antonucci through all stages of <u>United</u>

States v. Antonucci, et al., 04 Cr. 828 (SAS), including sentencing.

        4.     During the case, I discussed the possibility of a guilty plea with my client's brother and co-defendant, Dominic Antonucci, whose counsel was present.

        5.     In those discussions, I never stated or suggested in any way that Judge Shira A. Scheindlin, the United States District Court Judge assigned to the case, would not consider the United States Sentencing Guidelines or applicable enhancements when imposing sentence. As a lawyer who has practiced over twenty years in this District, I can state unequivocally that I never made any such representation, nor heard Carl F. Schoeppl, Dominic Antonucci's counsel, make any such representation.

Date:   April 23 2008

_____

CHARLES A. ROSS, ESQ.

2